**Larry LANGE et al.**

**v.**

**H. HENTZ & COMPANY et al.**

**Civ. A. No. 3–74–139–F.**

United States District Court,
N. D. Texas,
Dallas Division.

Sept. 9, 1976.

George H. Kolb, Dallas, Tex., for plaintiffs.

Robert S. Travis, Denis L. Toothe, Fort Worth, Tex., E. Russell Nunnally, Dallas, Tex., for defendants.

## MEMORANDUM ORDER

ROBERT W. PORTER, District Judge.

### I. NATURE OF THE CONTROVERSY

Plaintiffs posit, among other theories of recovery,[1] that Defendant-broker-dealers have breached certain duties owed to them as prescribed by Article III, Sections 2, 13 and 18[2] of the National Association of Security Dealers' [NASD] Rules of Fair Trade. Defendants have moved to dismiss all claims asserted against them which are bottomed upon a breach of those Rules. That motion is based upon an asserted absence of subject matter jurisdiction and a failure on the part of Plaintiffs to state a claim upon which relief can be granted. After reviewing the factual basis upon which this case rests, and after analyzing the scope and structure of the NASD Rules, I decide both that this Court is without jurisdiction to consider violations of NASD rules under § 27 of the Securities and Ex-

---

1. Claims are also made on a large variety of theories extant in federal and state law including violations of the Securities Act of 1933 and the Securities and Exchange Act of 1934 as well as Texas securities, fraud, fiduciary and negligence law, and Tennessee securities law.

2. Sections 2, 13 and 18 provide:

Sec. 2. In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

Sec. 13. A member controlled by, controlling, or under common control with, the issuer of any security, shall, before entering into any contract with or for a customer for the purchase or sale of such security, disclose to such customer the existence of such control, and if such disclosure is not made in writing, it shall be supplemented by the giving or sending of written disclosure at or before the completion of the transaction.

Sec. 18. No person shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance. CCH, *NASD Manual* ¶¶ 2152, 2163, 2168.

Plaintiffs also make a claim for a breach of Section 31, which did not become effective until September 24, 1973, long after the transactions on which this law suit is based took place. CCH, *NASD Manual* ¶ 2181. Plaintiffs' claims based upon § 31 are therefore dismissed.

change Act[3] and Title 28 U.S.C. § 1331, and that in any case no civil liability should be implied from the NASD Rules in question in this case.

As a factual predicate for their claims, Plaintiffs assert that Defendant Hall, a securities dealer and an employee of Defendant Hentz Co.[4] became involved in midwifing Semiconductor Substrates Corporation (SCS) which Hall purportedly represented to have a vast and unfulfilled potential. Ostensibly Hall was so enthusiastic over the future of SCS that he purchased a large block of cheap stock for himself. It is asserted, however, that Hall recognized, at least as early as 1972, that SCS would require a large infusion of capital to remain healthy. Together with a group of investors, but still unbeknownst to Hentz Company, which is alleged to have been blissfully though negligently unaware of the imminent SCS failure, Hall began to rig a market in SCS stock between the fall of 1972 and the spring of 1973 with the intent of driving the SCS stock price above the price of some 400,000 outstanding SCS warrants which were to expire in August of 1973. As that expiration date approached, Hall allegedly became frantic and induced Plaintiffs to purchase, or at least not to sell, SCS stock so as to protect his own substantial investment. The warrant price, however, was never reached and SCS, deprived of approximately $3,000,000.00 in unconverted warrants, was driven into ruin. This suit resulted as Plaintiffs are attempting to recover the monetary losses suffered as a result of the collapse of SCS.

## II. HISTORY, STRUCTURE AND SCOPE OF THE NASD RULES

From the concept of cooperative (industry-government) regulation developed in the National Recovery Administration was born the organization of the National Association of Security Dealers which, it was hoped, would provide an effective administrative starting point for the development and enforcement of high professional standards within the ranks of brokers and dealers in the securities industry. See S.Rep. No.1455, 75th Cong., 3d Sess. 3–5 (1938); H.R.Rep.No.2307, 75th Cong., 3d Sess. 4–5 (1938); S.Rep.No.379, 88th Cong., 1st Sess. 14–15 (1963). Then Chairman of the SEC, William O. Douglas, outlined the twin objectives of NASD in an address in early 1938, when he stated that NASD would bring about voluntary self-discipline in conformity to the law and would also encourage obedience to ethical standards beyond those which any law could establish. Address by SEC Chairman William O. Douglas, Bond Club of Hartford, Connecticut, Jan. 7, 1938, quoted in *Report of the Special Study of Securities Markets of the Securities and Exchange Commission,* H.R.Doc. No. 93, 88th Cong., 1st Sess., pt. 4, at 606 (1964). Senator Maloney, the author of the original NASD scheme, described the allocation of responsibility between NASD and the Commission as one in which:

> Congress has undertaken to provide a mechanism whereby the securities business of the country may deal with all problems of technical regulation, leaving to the Securities and Exchange Commission what it is hoped will be the residual position of policing the submarginal fringe which recognizes no sanctions save those of the criminal law and of dealing with those problems of regulation with which the industry, as organized under the act, finds itself unsuited or unable to deal. *Id.*

Thus self-regulation was to encompass more than simple illegality. Guiding the broker-dealer to do that which is right and fair was to be as much a goal of cooperative self

---

**3.** Throughout this decision the abbreviation SEA is used for Securities Exchange Act. Moreover the following list of SEA section numbers are used without reference to their correlevant United States Code citations which are provided below for the convenience of the reader.

| | |
|---|---|
| § 6(b)(SEA) . . . | 15 U.S.C. § 78f |
| § 15(SEA) . . . . | § 78o |
| § 27(SEA) . . . . | § 78aa |
| § 32(SEA) . . . . | § 78ff |

**4.** The issue of Hayden Stone Inc.'s liability as a successor to Hentz Co. has been severed from the determination of the liability of Hentz and Hall.

regulation as was condemning that which is wrong and unfair. Rules, example, and professional banishment were to be used to attain the former, while the jailhouse was to be used to stamp out the latter.

The structure of the NASD–SEC relationship is contained in a few important sections of the SEA. Section 15A provides:

Any association of brokers or dealers may be registered with the Commission as a national securities association . . ..

as long as sanctions are imposed for:

conduct . . . inconsistent with just and equitable principles of trade. [SEA 6(b)]

A dealer's registration may be suspended or revoked for the violation of Section 15A. All disciplinary actions by NASD against members or associates of such members are subject to Commission review on the SEC's own motion or by motion of the parties [SEA § 15A(g)] with the standard required for reversal being that the penalty imposed by NASD is "excessive or oppressive, having due regard to the public interest". SEA § 15A(h). For violations of its rules NASD may: (1) censure a member broker-dealer or one associated therewith, and/or (2) fine the member or associate up to $5,000, and/or (3) suspend a member or associate, and/or (4) expel a member or revoke an associate's registration, and/or (5) suspend or bar a member or associate from association with all members, and/or (6) impose any other appropriate and fitting penalty which is just. CCH *NASD Manual Art. III,* § 1, ¶ 2301, at 2114 (1970). Restitution is not available in a NASD proceeding, although costs may be imposed. CCH *NASD Manual Art. III,* § 1, ¶ 2302, at 2116 (1969). Yet despite owing its existence and in large measure its power and prestige to the SEC, NASD is still a private association governed by its own rules as developed and applied by its own members.

## III. JURISDICTION

■ *Title 15 U.S.C. § 27.* The question in the first instance of whether this Court has jurisdiction to hear this case must depend upon the language of the statutory jurisdictional grants and that language in turn must be interpreted with an understanding of NASD's unique historical and functional setting as an entity separate and apart from the SEC. Sections 27 and 32 provide respectively that:

The district courts of the United States . . . shall have exclusive jurisdiction of violations . . . thereunder, and of all suits in equity and actions at law brought to enforce *any liability or duty created by this title or the rules and regulations thereunder.* (emphasis supplied)

And any person who willfully *violates any provision of this title, or any rule or regulation thereunder* the violation of which is made unlawful . . . shall upon conviction be fined not more than $10,000 or imprisoned not more than two years . . . (emphasis supplied)

While in contrast Section 29(a), provides:

Any condition, stipulation, or provision binding any person to waive compliance with any provision . . . thereunder, or of any *rule of an exchange* required thereby shall be void. (emphasis supplied)

Clearly the issue presented by the above language is whether Congress intended to extend exclusive federal jurisdiction to any "duty" created under the SEA even if that duty were created by a private association's rules or whether it was meant that only those rules and regulations promulgated directly under the guidance of the SEC are to give rise to federal jurisdiction. Commentators have divided on the subject. Compare. Rediker, *Civil Liability of Broker-Dealers Under SEC and NASD Suitability Rules,* 1970 Sec.L.Rev. 279, with Lowenfels, *Implied Liability Based Upon Stock Exchange Rules,* 66 Col.L.Rev. 12, 22; *Implied Securities Liabilities,* 51 Cornell L.Rev. 633, 647 (1966). In *Colonial Realty Corp. v. Bache,* 358 F.2d 178 (2nd Cir.) cert. denied 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966) Judge Friendly advanced the argument that the omission of the phrase "rules of an exchange" from Sections 27 and 32 and the careful placement of that language

in Section 29(a) meant that Congress intended that there be conferred on the federal courts exclusive jurisdiction only for violations of rules developed under SEC authority.[5] See also, 6 L. Loss, *Securities Regulation*, 3866 (Supp.1969). I agree, recognition of the distinction between the phrases "rules of the exchange" and "rules and regulations under the SEA" is a wise one. By the language contained in Section 32, which is all but identical to the language contained in Section 27, Congress could not have meant that NASD should be given the authority to define new crimes. That task lies with Congress or perhaps, in narrowly defined circumstances, with the SEC. Yet to interpret the words "the rules and regulations" under the SEA in Section 27 to include the words "rules of the exchange" when they nowhere appear in the text of Section 27 would be tantamount to recognizing such broad authority. And such authority, in addition to being rife with the constitutional problems of delegation and vagueness, would inevitably flood the judicial system with what Judge Friendly in *Colonial* has correctly termed the "garden variety" dispute between the broker-dealer, and investor. In addition, as important a consideration is the fact that exclusive federal jurisdiction must follow from such interpretation with the result being the segregation of the investor from traditional state remedies, including arbitration, which may exist in the state system for breach of NASD rules. This Court will not lightly close those avenues for dispute resolution and will not at the same time dramatically expand federal court jurisdiction without a clear and convincing mandate that Congress intended such a result; an intention which has not been definitively demonstrated in this case.

At the heart of the concept of cooperative regulation lies the need for professional supervision and guidance by and for other professionals. To some degree the Courts might attempt to pick and choose the rules which are ethical mandates and segregate them from those which are legal rules and thereby limit civil liability for violations of NASD rules, See *Colonial Realty, supra*, but the issue at this juncture in this decision is more fundamental. Here it must be decided which institution [NASD or the Courts] *should* have the power—the jurisdiction—to enforce rules which were designed to serve as guidelines for what "ought to be" in the broker-dealer world. From the foregoing historical and structural sketch of the place NASD plays in the total scheme of securities regulation, it is clear that the responsibility for policing the unethical was left to NASD with the SEC using the antifraud provisions of the statute to reach criminal and fraudulent acts. By such recognition of NASD's responsibility I certainly do not mean that NASD is free to flag in its rule making and enforcement tasks; the SEC has a place in representing the public in the NASD sphere of responsibility and has the power to assure continued NASD vigor. In short, those rules which go beyond that which is simply legal and which create civil liability have been placed in the hands of NASD and it is this Court's decision that they remain there.

*Title 28 U.S.C. § 1331.* Further basis for federal jurisdiction for violations of NASD rules is urged under Title 28 U.S.C. § 1331. I hold that a breach of NASD rules is simply a breach of a private association's rules, although that association is one which is closely related to the SEC. This case, therefore, does not present a question which arises under the laws of the United States. Construing Section 1331 narrowly as I must, I find no remedy expressly granted by Congress for a breach of NASD rules, no claim which is based upon a direct construction of the SEA and no distinct policy of the SEA which requires that federal principles control the disposition of the claim. I find instead a simple claim for the breach of a private association's rules of fair trade. See *T. B. Harms Co. v. Eliscu*, 339 F.2d 823 (2nd Cir. 1964); Cf. *Romero v. International*

---

5. Admittedly NASD Rules are not rules of an exchange, but the argument that Congress understood the problems created by delegating rule making authority to a private group, even when that group is an exchange, applies with equal, if not greater vigor to the NASD case.

*Terminal Operating Co.*, 358 U.S. 354, 379, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959). Under those circumstances, a breach of NASD rules, even if such a breach were to give rise to liability, is not a question which properly "arises under the Constitution, laws or treaties of the United States" within the meaning of Section 1331.

## IV. CIVIL LIABILITY FOR BREACH OF NASD RULES OF FAIR TRADE

■ *Implied Liability:* Whether this Court has the jurisdiction to hear a claim for a breach of NASD rules under Section 27 and/or Section 1331 is a separate and distinct question from that of whether civil liability arises from a breach of those rules. In addition to finding no jurisdictional base to support a claim for breach of NASD rules, I also hold that no civil liability flows from a breach of Sections 2, 13, or 18 of NASD rules.

Judge Friendly in the seminal case *Colonial Realty v. Bache and Co.*, 358 F.2d 178 (2d Cir. 1965), cert. denied, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), refused to imply a private right of relief from NASD's general business conduct rule. *See NASD Manual* Art. III, § 1 ¶ 2151 at 2014 (1973). In *Colonial Realty*, Bache sold securities in Colonial's margin account during a dip in the market. Claiming that Bache failed to conduct its business in a manner consistent with "just and equitable" principles of trade, Colonial relied upon an alleged oral agreement with Bache that it [Bache] would not require a margin greater than the NYSE minimum requirements. The Court held that Congress did not intend that violations of all exchange rules would support a claim for private relief. It found, rather, that the "just and equitable" requirement was extremely broad and that Congress intended to rely only upon the disciplinary function of the Exchange to vindicate such broker-dealer misconduct. The Court suggested, however, that more specific rules, such as NYSE Rule 452, which outlines the method of voting stock held in a street name, might support a private action because of the "integral part [it played] in SEC regulation." 358 F.2d at 182. This emphasis on the place of the NASD rule in the complete regulation of the securities market gave rise to what has been termed the *Colonial Realty* substitution test. The more specific the rule and the more integral a part it plays in the total scheme of securities regulation, the more likely, it is said, that the court should infer liability. *See* Lowenfels, *Private Enforcement in the Over-the Counter Securities Markets: Implied Liabilities Based on NASD Rules*, 51 Cornell L.Rev. 633, 650 (1966).

In contrast with the analysis in *Colonial Realty* is that in *Buttrey v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 410 F.2d 135 (7th Cir. 1969), where the Seventh Circuit held that liability could be implied from a breach of NYSE Rule 405. Emphasizing investor protection and the remedial purpose of the NYSE Rules instead of stressing the place the regulation played in the total context of investor protection as did *Colonial Realty*, the Court in *Buttrey* concluded that a violation of NYSE Rule 405, while not *per se* actionable, gives rise to civil liability in cases which "are tantamount to fraud". Case development since *Buttrey* has been halting and fragmented, with the courts torn between recognition of the need in particular fact situations to provide some remedy for the victimized investor and the need in other cases to allow for flexibility in applying a rule once it is so characterized. Rigid *per se* liability seems to have been rejected in favor of a liability framework based upon a more balanced view of the multifaceted nature of the broker-dealer-investor relationship.[6]

6. For an exhausting but certainly not exhaustive list of this trend see *Hecht v. Harris, Upham & Co.*, 283 F.Supp. 417 (N.D.Cal.1968), *modified on damages grounds*, 430 F.2d 1202 (9th Cir. 1970); *Mercury Inv. Co. v. A. G. Edwards & Sons*, 295 F.Supp. 1160 (S.D.Tex. 1969); *Piper, Jaffrey & Hopwood, Inc. v. Ladin*, 318 BNA Sec.Reg. & L.Rep. A–27 (D.Iowa, Sept. 10, 1975); *State of Utah v. duPont Walston, Inc.*, [1974–75 Transfer Binder] CCH Fed. Sec.L.Rep. ¶ 94, 812 at 96, 713 (D.Utah 1974); *Gurvitz v. Bregman & Co.*, 379 F.Supp. 1283 (S.D.N.Y.1974); *Golob v. Nauman Vandervoort, Inc.*, 353 F.Supp. 1264 (N.D.Ohio 1972); *Wells v. Blythe & Co.*, 351 F.Supp. 999 (N.D. Cal.1972); *McCurnin v. Kohlmeyer & Co.*, 347

Since *Colonial Realty* and *Buttrey* were decided, the Supreme Court, speaking through Mr. Justice Brennan in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26, 36 (1975), has formally set out the factors to be considered in determining whether a private remedy is implicit in a statute not expressly providing for one. In a four step analysis the Court requires that the following questions be addressed: (i) whether the plaintiff is one of the class for whose *special benefit the statute* was enacted; (ii) whether there is any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; (iii) whether it is consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff, and (iv) whether the cause of action is one which has traditionally been relegated to the states.

This historical roots of the NASD regulations have already been reviewed above and have been found to lie in the concept of cooperative self-regulation. The special focus of the NASD rules is not and has never been protecting the investor-public, except to the extent that any rule of its type has the effect of protecting the public generally. *Cort v. Ash, supra.* The purpose of the rules is found in the desire to professionalize the securities industry. To that end, the ethical has been emphasized over the legal and as a result the class of persons which has *specially benefitted* from the adoption of NASD Rules is the class of security dealers and not the public. One of the most emphatic statements of that proposition is found in the Report of the Special Study of Securities Markets of the Securities and Exchange Commission which provides:

> [There] is a need for raising the level of conduct in the over-the-counter securities business to a highly professionalized plane [which] could best be met through *ethical standards* adopted and enforced by self-governing bodies of individuals

actually engaged in the business rather than increased and pervasive Government controls based upon rigid proscription. From this argument there have emerged two working principles: opposition to 'legalisms' and avoidance of a 'bureaucracy' [pt. 4 at 609]

The above passage also demonstrates the lack of a legislative intent to create a civil remedy for a breach of the NASD Rules. Indeed, a fair reading of that passage evidences a clear intent to avoid "legalism" and to concentrate on simple ethical guidelines. Further supporting that analysis are the words of the NASD rules themselves which, for the most part, are affirmatively and rather vaguely phrased in terms of what shall be rather than in terms of concrete proscriptions. Thus for example, one is not directed *not* to recommend that which is unsuitable but is instead directed to recommend that which is suitable. That semantic difference is important, for in the former case the range of violations is narrowed by restricting the penalty to the unsuitable match between the investor and the security while in the latter case *the* suitable security is required to be matched with *the* proper shareholder, an admirable but difficult challenge. Finally, one cannot look to Section 27, as was the case in *J. I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423, to find an implied intent to create civil liability for, as has been discussed above, Section 27 contains no mention of the rules of an exchange and only provides that jurisdiction is conferred for rules promulgated under the Act itself.

In addition to the historical and semantic manifestations of legislative intent, there are concrete policy objectives which would be thwarted if civil liability were to be implied. For example, there might be a tendency on the part of NASD to lower its high standards of ethical guidance and quite possibly thereby to reduce their efficacy. Indeed the delicate concept of self-

F.Supp. 573 (E.D.La.1972), aff'd 477 F.2d 113 (5th Cir. 1973); *Aetna Cas. & Surety Co. v. Paine, Webber, Jackson & Curtis* [1969–70 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 92, 748 at 99, 272 (D.N.Ill.1970); *DeRenzis v. Levy,* 297

F.Supp. 998 (S.D.N.Y.1969); *Bush v. Bruns Nordeman & Co.* [1972–73 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 93, 674 at 93,006 (S.D.N.Y.1972).

regulation might be destroyed by vigilante enforcement of the NASD Rules. Even in those cases in which liability has been implied, the courts have been quite tentative in their holdings and have generally followed *Buttrey* only to the extent that actionable fraud is present. One may then ask, with all that can be lost in terms of self-regulation and with the solid evidence that Congress never intended to create civil liability, why should such a limited goal of providing a small increased increment of protection to the victimized investor be so vigorously sought? The answer nowhere appears.

In analyzing the fourth element of the *Cort* test one must begin by asking whether the cause of action urged would invade a province which has traditionally been governed by state courts. The Plaintiffs, in the present case, have brought suit, not only on the fraud based federal notions of liability [10b–5 and 17(a)] but they have also alleged that the Defendants have violated fiduciary duties and negligence concepts which have historically defined the scope and nature of the relationship between the broker and the investor. Erosion of the state defined relationships would no doubt occur if federal law were to expand into the non-fraud area already claimed by the states. See e. g., *Twomey v. Mitchum*, 262 Cal.App.2d 690, 69 Cal.Rptr. 222 (1968); *Courtland v. Walston & Co.*, 340 F.Supp. 1076, 1082–82 (S.D.N.Y.1972); *Arleen v. Hughes*, 27 SEC 629, 952 (1948), order aff'd 85 U.S.App.D.C. 56, 174 F.2d 969 (1949); See also 3 L. Loss, *Securities Regulation*, 1500–08. It is also worth noting that there is little likelihood that federal policy would be thwarted by leaving the responsibilities outlined in the Rules of Fair Trade to NASD and the SEC while continuing to allow their interplay with state negligence and fiduciary theories.

Thus in summary, the Court has no jurisdiction to decide the issue of liability under NASD rules in this case, but even if that jurisdiction were to be assumed to exist, under the analysis of *Cort* as well as under the considerations outlined in *Colonial Real-*

*ty*, no civil liability would arise from a violation of Sections 2, 13 and 18 of the NASD Rules of Fair Trade.

■ *Negligence Per Se:* NASD rules, however imprecisely they are drafted, do prescribe conduct which the NASD member should attempt to achieve. Traditionally, rules of this sort have served as bench marks for a determination of the reasonableness of a defendant's actions. [See cases collected in Thayer, *Public Wrong and Private Action*, 27 Harv.L.Rev. 317 (1914)]. Under the negligence *per se* concept, it is assumed that the legislature actually sets the level of care which is to be followed by society. A violation of that standard establishes liability, although elements of causation and damages must still be proven. Those courts which have applied the doctrine have done so on fairly limited terms, focusing their analysis on two points: the risk against which the act in question was designed to protect, and the class of persons which was to be protected. If the risk which culminated in the injury were not that to be guarded against, [see *Gorris v. Scott* (1874) L.R. 9 Ex. 125] or if the plaintiff were not in the protected class [*Opple v. Ray*, 208 Ind. 450, 195 N.E. 81 (1935)] then the statutory violation would not constitute negligence *per se*, but only evidence of negligence or no evidence at all. See Wigmore, *A Treatise on the Anglo-American System of Evidence*, § 416(b) (3rd ed. 1940).

■ As has been examined above, the special class of persons sought to be benefitted or protected by NASD rules is in reality the class of NASD members themselves and generally not the public at large. Therefore it follows that negligence *per se*, even under traditional common law analysis, is not applicable to the instant case. Nevertheless a proven violation of the rules is more than a mere irrelevancy and should be a factor the determination of what standards should be applied to the stock brokerage industry. See, *Mercury Investment Co. v. Edwards*, 295 F.Supp. 1160 (S.D.Tex. 1969); *Piper, Jaffray & Hopwood v. Ladin*, 399 F.Supp. 292 (S.D.Iowa 1975); *Marshall*

*v. Isthmian Lines, Inc.,* 334 F.2d 131 (5th Cir. 1964); see generally Morris, *The Role of Administrative Safety Measures in Negligence Actions,* 28 Tex.L.Rev. 143 (1949). It is therefore the decision of this Court that the NASD Rules may be used as evidence of the present standard of care which the NASD member should achieve. It is additionally the decision of this Court that NASD rules are admissible on the issue of what fiduciary duties are owed by a broker to an investor. Thus, while not implying a civil right of action from NASD Rules, I do focus on their nature as a functional guide which provides a means to determine the standard of commercial morality which is expressly sought by NASD members. Such self-regulating rules, while not determinative, cannot be wholly ignored as irrelevant to the standards which a NASD member is to be guided in the everyday broker-dealer transaction.

Therefore, Defendants' Motion to Dismiss Plaintiffs' claims based upon Sections 2, 13, 18 and 31 of the NASD Rules of Fair Trade is hereby granted.

It is so ORDERED.