Alex COLMAN, Plaintiff,

v.

D. H. BLAIR & CO., INC., Morton Davis, Murray Koppelman and Dr. Phillip David, Defendants.

No. 80 Civ. 6368 (WCC).

United States District Court,
S. D. New York.

Aug. 3, 1981.

Winer, Neuburger & Sive, P. C., New York City, for plaintiff; Eric Bregman, New York City, of counsel.

Bachner, Tally & Mantell, New York City, for defendants, D. H. Blair & Co., Inc., Morton Davis and Murray Koppelman; H. Richard Penn, Jill Hayman, New York City, of counsel.

O'Sullivan, Wolff, Karabell & Graev, New York City, for defendant, Dr. Phillip David.

## OPINION AND ORDER

CONNER, District Judge:

This is an action for damages for alleged securities fraud. Plaintiff Alex Colman ("Colman") is an investor and former customer of defendant D. H. Blair & Co., Inc. ("Blair"), a securities broker-dealer and member of the National Association of Securities Dealers, Inc. ("NASD") and the New York Stock Exchange ("NYSE"). Defendant Morton Davis ("Davis") is the president of Blair. Defendant Murray Koppelman ("Koppelman") is a Blair employee who handled Colman's account. Defendant Dr. Phillip David ("David") is Davis's brother and is alleged to be a control person of Blair and an advisor to Koppelman. Colman alleges fraud in connection with the handling of his account, including churning, willful misrepresentations and failure adequately to supervise and control the transactions in Colman's account.

Defendants have moved under Rule 12(b)(6), F.R.Civ.P., to dismiss Counts III and IV of the Second Amended Complaint, as well as Paragraph 22(c) of Count I. The Second Amended Complaint is in eight counts. Count I alleges violations of Section 10(b) of the Securities Exchange Act of

1934 ("Act"), 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.10b–5. Paragraph 22(c) of Count I alleges that the failure to disclose that defendants had "violated Blair's procedural rules for the management of customer accounts as set forth in Blair's compliance manual and other written and oral instructions to Blair employees" was one of several misrepresentations or omissions in violation of Rule 10b–5. Count III alleges violations of NYSE Rules 405, 342(b) and 408. Count

IV alleges violations of Article III of the NASD Rules of Fair Practice ("NASD Rules"), specifically Sections 1, 2, 18 and 27.

The motion of defendants is based upon their contention that there is no implied private right of action for violation of the NYSE and NASD rules specified in Counts III and IV, respectively. Defendants also seek dismissal of Paragraph 22(c) of Count I on the ground that it circuitously attempts to plead a violation of Section 27 of the NASD Rules.[1]

1. The text of the relevant NYSE and NASD Rules is as follows:

NYSE Rule 342(d) provides:

"The general partners or directors of each member organization shall provide for appropriate supervisory control and shall designate a general partner or principal executive officer to assume overall authority and responsibility for internal supervision and control of the organization and compliance with securities' laws and regulations. This person shall:

"(1) delegate to qualified principals or employees responsibility and authority for supervision and control of each office, department or business activity, and provide for appropriate procedures of supervision and control.

"(2) establish a separate system of follow-up and review to determine that the delegated authority and responsibility is being properly exercised."

NYSE Rule 405 provides:

"Every member organization is required through a general partner, a principal executive officer or a person or persons designated under the provisions of Rule 342(b)(1) to

"(1) Use due diligence to learn the essential facts relative to every customer, every order, every cash or margin account accepted or carried by such organization and every person holding power of attorney over any account accepted or carried by such organization.

Supervision of Accounts

"(2) Supervise diligently all accounts handled by registered representatives of the organization.

Approval of Accounts

"(3) Specifically approve the opening of an account prior to or promptly after the completion of any transaction for the account of or with a customer, provided, however, that in the case of branch offices, the opening of an account for a customer may be approved by the manager of such branch office but the action of such branch office manager shall within a reasonable time be approved by a general partner, a principal executive officer or a person or persons designated under the provisions of Rule 342(b)(1). The member, general partner, officer or designated person approving the opening of the account shall, prior to giving his

approval, be personally informed as to the essential facts relative to the customer and to the nature of the proposed account and shall indicate his approval in writing on a document which is a part of the permanent records of his office or organization.

Common Sales Accounts

"(4) To facilitate the isolated liquidation of securities valued at $1,000 or less registered in the name of an individual who does not have an account, and which are not part of any distribution, a member organization may sell the securities through a common sales account set up for the specific purpose of handling such sales without sending a periodic statement to the customer as required by Rule 409, provided:

"(a) The customer is identified as the individual in whose name the securities are registered,

"(b) The securities are received by the member, at or prior to the time of the entry of the order, in the exact amount to be sold in good delivery form,

"(c) A confirmation is sent to each customer,

"(d) All proceeds of such sales are paid out on or immediately following settlement date, and

"(e) The record made in the common sales account includes as to each transaction: customer's name and address, name and amount of securities to be sold, date received, date sold, amount per share, total amount credited to the account, total amount of check issued to the customer and the date of disbursement."

NYSE Rule 408 provides:

"(a) No member, allied member or employee of a member organization shall exercise any discretionary power in any customer's account or accept orders for an account from a person other than the customer without first obtaining written authorization of the customer.

"(b) No member, allied member or employee of a member organization shall exercise any discretionary power in any customer's account, without first notifying and obtaining the approval of another person delegated under Rule 342(b)(1) with authority to approve the handling of such accounts. Every order entered on a discretionary basis by a member, allied mem-

The starting point for this Court's analysis of the issues presented on the instant motion must be *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2d Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966). There a customer sought to press claims against a broker-dealer for, *inter alia*, failure to conduct its dealings in a manner consistent with just and equitable principles of trade, in violation of various NYSE and NASD Rules, including NASD Rules, Section 1. The question presented was whether an implied private right of action exists under such rules.

The Court began its analysis by examining the then-existing Sections 6(b) and 15A(b)(8) of the Act, which generally prohibit the registration of national securities exchanges and broker-dealer associations, respectively, unless such organizations promulgate rules of fair trade and disciplinary procedures to assure compliance by members with such rules and the Act.[2] These statutory sections authorize wide discretion in establishing standards and principles that should govern the trading of securities. *Id.* at 181. The Court concluded that the explicit reliance in the statutes upon the disciplinary functions of the exchanges and associations and the absence of such rules from the grant of federal jurisdiction in Section 27 of the Act, 15 U.S.C.

ber or employee of a member organization must be identified as discretionary on the order at the time of entry. Such discretionary accounts shall receive frequent appropriate supervisory reviews by a person delegated such responsibility under Rule 342(b)(1), who is not exercising the discretionary authority. A written statement of the supervisory procedures governing such accounts must be maintained.

"(c) No member or allied member or employee of a member organization exercising discretionary power in any customer's account shall (and no member organization shall permit any member, allied member, or employee thereof exercising discretionary power in any customer's account to) effect purchases or sales of securities which are excessive in size or frequency in view of the financial resources of such customer."

Article III of the NASD Rules provides in relevant part:

Section 1: "A member, in the conduct of his business, shall observe high standards of commercial honor and just and equitable principles of trade."

Section 2: "In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs."

Section 18: "No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."

Section 27: "(a) Each member shall establish, maintain and enforce written procedures which will enable it to supervise properly the activities of each registered representative and associated person to assure compliance with applicable securities laws, rules, regulations and statements of policy promulgated thereunder and with the rules of this Association.

"(b) Final responsibility for proper supervision shall rest with the member. The member shall designate a partner, officer or manager in each office of supervisory jurisdiction, including the main office, to carry out the written supervisory procedures. A copy of such procedures shall be kept in each such office.

"(c) Each member shall be responsible for keeping and preserving appropriate records for carrying out the member's supervisory procedures. Each member shall review and endorse in writing, on an internal record, all transactions and all correspondence of its registered representatives pertaining to the solicitation or execution of any securities transaction.

"(d) Each member shall review the activities of each office, which shall include the periodic examination of customer accounts to detect and prevent irregularities or abuses and at least an annual inspection of each office of supervisory jurisdiction.

"(e) Each member shall have the responsibility and duty to ascertain by investigation the good character, business repute, qualifications and experience of any person prior to making such a certification in the application of such person for registration with this Association.

"(f) 'Office of supervisory jurisdiction' means any office designated as directly responsible for the review of the activities of registered representatives or associated persons in such office and/or other offices of the member."

2. Sections 6(b) and 15A(b)(8) have since been amended, but as modified still require such rules as a prerequisite to registration. See, 15 U.S.C. §§ 78f(b)(5) and (6) and 78*o*–3(b)(6) and (7).

§ 78aa, are indicative that "Congress did not intend violations of all rules adopted [thereunder] to give rise to civil claims under federal law." *Id.* The Court, however, declined to hold that such rules cannot provide the basis for implying a private right of action; since the rules as a general matter provide "what amounts to a substitute for regulation by the SEC itself," *id.* at 182, "a particular ... rule could thus play an integral part in SEC regulation ...," *id.* Accordingly, a

"court must look to the nature of the particular rule and its place in the regulatory scheme, with the party urging the implication of a federal liability carrying a considerably heavier burden of persuasion than when the violation is of the statute or an SEC regulation. The case for implication would be strongest when the rule imposes an explicit duty unknown to the common law." *Id.*

The Court concluded that NYSE or NASD Rules which merely proscribe generally acts "inconsistent with just and equitable principles of trade" do not provide a basis for an implied private right of action against an NYSE or NASD member.

Applying the standards set forth in *Colonial,* district courts in this Circuit reached various results regarding the implication of private causes of action for violation of NYSE or NASD Rules. See, *e. g., Rolf v. Blyth Eastman Dillon & Co., Inc.,* 424 F.Supp. 1021 (S.D.N.Y.1977), *aff'd* (on alternative grounds), 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (fraudulent conduct actionable under NYSE Rule 405 and NASD Rules, Section 2); *Plunkett v. Dominick & Dominick, Inc.,* 414 F.Supp. 885 (D.Ct.1976) (Newman, J.) (no implied cause of action under NYSE Rule 405 and NASD Rules, Sections 2 and 27, even though, subsequent to *Colonial,* SEC adopted similar rules); *Architectural League of New York v. Bartos,* 404 F.Supp. 304 (S.D.N.Y.1975) (violation of NASD Rules not basis of independent cause of action); *Gurvitz v. Bregman & Co.,* 379 F.Supp. 1283 (S.D.N.Y.1974) (no implied cause of action under NASD Rules, Section 21); *Starkman v. Serousi,* 377 F.Supp. 518

(S.D.N.Y.1974) (on facts presented, implied cause of action for violations of NYSE Rules 345.17, 345.19 and 405).

▪ Since *Colonial,* however, the Supreme Court has given new guidance regarding the implication of private rights of actions from federal statutes and regulations. In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 264 (1975), the Court ruled that no private cause of action for damages against corporate directors is to be implied in favor of a corporate shareholder under 18 U.S.C. § 610, a criminal statute prohibiting certain political contributions by corporations. In so ruling, the Court delineated the following four factors to be examined in determining the propriety of an implied private remedy:

(1) Is the plaintiff one of the class for whose especial benefit the statute was enacted?

(2) Is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?

(3) Is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?

(4) Is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? *Id.* at 78, 95 S.Ct. at 2088.

More recently, the Court has had two occasions to address the "implied right of action" question in the securities laws area. In *Touche Ross & Co. v. Reddington,* 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the Court ruled that no implied right of action exists under Section 17(a) of the Act in a suit by customers of a securities brokerage firm against the firm's auditors. The Court evinced a conservative approach to the implication of private damage actions:

"To the extent our analysis in today's decision differs from that of the Court in [*J. I. Case Co. v. Borak,* 377 U.S. 426 [84 S.Ct. 1555, 12 L.Ed.2d 423] (1964)], it suf-

fices to say that in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action, and we follow that stricter standard today." *Id.* at 578, 99 S.Ct. at 2490.

The Court identified its task as "limited solely to determining whether Congress intended to create the private right of action . . . ." *Id.* at 568, 99 S.Ct. at 2485. Pointing to (1) the fact that Section 17(a) neither confers rights on private parties nor proscribes any conduct as unlawful, but rather merely requires the maintenance and filing of certain records and reports, (2) the silence of the legislative history on the subject of an implied private remedy, and (3) the existence of contemporaneously enacted sections of the Act in which Congress specified those circumstances in which it intended to provide for private actions, the Court found no basis for inferring Congressional intent to allow a private damage remedy.

As to the four factors set down in *Cort v. Ash*, the Court indicated that each of these factors is not entitled to equal weight. Where there is no evidence of Congressional intent to create a private right of action, the inquiry is ended and analysis of the remaining factors is unnecessary. *Id.* at 575–76, 99 S.Ct. at 2489.

Similarly, in *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979), the Court held that Section 206 of the Investment Advisers Act of 1940, 15 U.S.C. § 80b–1, *et seq.*, created no implied private damage remedy, relying upon (1) the existence of criminal and administrative means for enforcing compliance with Section 206 suggesting that Congress had selected the exclusive means of enforcement, (2) the existence of companion statutory sections providing for private suits for damages in prescribed circumstances, and (3) the omission of any reference to "actions at law" in the jurisdictional section of the Act. The Court reiterated its position outlined in *Touche Ross, supra*, that "the mere fact that the statute was designed to protect advisers' clients does not require the implication of a private

cause of action for damages on their behalf." *Transamerica, supra* at 24, 100 S.Ct. at 249.

Following the *Touche Ross* and *Transamerica* decisions, those courts which have addressed the issue have generally ruled that no implied private right of action may be premised upon violations of NYSE or NASD Rules.

The Ninth Circuit, in *Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir. 1980), following the approach of the Supreme Court in *Touche Ross* and *Transamerica*, found no Congressional intent to create private rights of action for violation of stock exchange or broker-dealer association rules, and thus affirmed the dismissal of claims under NYSE Rule 405 and NASD Rules, Section 2. The court ruled that Section 6(b) of the Act, which merely conditions the registration of stock exchanges upon the creation of self-disciplinary rules and procedures, does not evidence the requisite legislative intent because, as the Supreme Court noted in *Touche Ross* in reaching the same conclusion as to Section 17(a) of the Act, it " 'neither confers rights on private parties nor proscribes any conduct as unlawful.' " *Jablon, supra*, at 680, quoting from *Touche Ross, supra*, 422 U.S. at 569, 99 S.Ct. at 2485. The court reached a similar conclusion as to Section 15A(b)(6) of the Act, which parallels Section 6(b) regarding broker-dealer associations.

Similar conclusions have been reached by other courts. See, *e. g., Hoover v. E. F. Hutton & Co., Inc.* [1980] Fed.Sec.L.Rep. (CCH) ¶ 97,654 (E.D.Pa.1980) ("The *Touche Ross* and *Transamerica* cases have significantly undermined the rationale of the cases permitting a private right of action under New York Stock Exchange rules."); *Lange v. H. Hentz & Co.*, 418 F.Supp. 1376 (N.D.Tex.1976) (no implied private cause of action for violations of NASD Rules after *Cort v. Ash*). But see *Smith v. Smith Barney, Harris, Upham & Co., Inc.*, 505 F.Supp. 1380 (W.D.Mo.1981) (implied private cause of action under NYSE Rule 405; no mention of *Cort v. Ash, Touche Ross* or *Transamerica*).

To date, the Second Circuit has not definitively indicated its view of the impact of the three intervening Supreme Court decisions upon *Colonial* and the question of implied private actions for violations of NYSE and NASD Rules. The Second Circuit, has, however, acknowledged that "[r]ecent Supreme Court decisions have stressed that courts should be reluctant to imply private rights of action." *Riegel Textile v. Celanese Corp.*, 649 F.2d 894 at 897 (2d Cir. 1981).

In *Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980), *cert. granted*, 450 U.S. 910, 101 S.Ct. 1346, 67 L.Ed.2d 332 (1981), the Court of Appeals held that implied causes of action exist under the Commodity Exchange Act as amended in 1974. Judge Mansfield, dissenting, expressed the following view regarding the issue before this Court:

> "Plaintiffs also charge that the defendant brokers violated Exchange Rule § 44.02 by failing to have liquidating orders placed within five minutes after the close of the trading limits even though they knew or should have known that their customers could not deliver potatoes. Since it is now well recognized that a private right of action may not be implied for a violation of a rule of the New York Stock Exchange, *Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir. 1980), it is not surprising that the majority makes no effort to claim that plaintiffs here have a cause of action against the brokers for their alleged violation of Exchange Rule § 44.02. Accordingly, we need not address the issue." *Id.* at 338 n.8.

In response, Judge Friendly, writing for the majority, stated:

> "While the point is of no great importance as regards this case, we take issue with the statement in the dissent, page 342, that *Colonial Realty Corp. v. Bache & Co.*, 358 F.2d 178 (2 Cir.), *cert. denied*, 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), held that violation of a rule of the New York Stock Exchange could not give rise to an implied cause of action. Our conclusion was that violation of certain types of rules would give rise to an implied cause of action, especially 'when the rule imposes an explicit duty unknown to the common law,' but that violation of the rule there at issue, requiring brokers to observe 'just and equitable principles of trade,' did not. *Id.* at 182–83. We likewise do not accept the statement in footnote 8 that 'it is now well recognized that a private right of action may not be implied for a violation of a rule of the New York Stock Exchange,' citing *Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9 Cir. 1980). Although the particular rule at issue in *Jablon*, the 'know your customer' rule, Rule 405 of the New York Stock Exchange, seems analogous to the rule at issue in *Colonial Realty* and we thus have no quarrel with the result, we do not necessarily accept the broad language of the *Jablon* opinion. In view of our conclusion that plaintiffs have alleged violations of other sections of the Act which give rise to private claims, it is unnecessary for us now to decide whether such an action would lie for violation of NYME Rule § 44.02." *Id.* at 296 n.11.

More recently, in *State Teachers Retirement Board v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981), the Court of Appeals affirmed the dismissal of a claim of failure to comply with Section A2 of the NYSE Company Manual, which states that a corporation should be prepared to make an immediate announcement of important corporate developments if unusual market activity occurs prior to its announcement. The district court had held that no implied private action could be based upon Section A2, relying upon *Colonial* but noting also that *Transamerica* dictated that Congressional intent be the ultimate criterion. In affirming, the Second Circuit distinguished its prior decision in *Van Gemert v. Boeing Co.*, 520 F.2d 1373 (2d Cir.), *cert. denied*, 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975), which had held that the NYSE Listing Agreement and Company Manual could support a private right of action against issuers of securities. In so doing, the court set forth the following analysis relevant to the instant issue:

"In the case at bar, we are faced with a corporation's obligations under section A2 of the Exchange's Company Manual to disclose general corporate news. This obligation is broader than the specific notice requirements involved in *Van Gemert.* Moreover, unlike the rules in *Van Gemert*, section A2 of the Exchange's Company Manual touches upon areas of corporate activity already extensively regulated by Congress and the Securities and Exchange Commission. Thus, a legislative intent to permit a federal claim for violation of the Exchange's Company Manual rules regarding disclosure of corporate news cannot be inferred. In any case, although the debate in this circuit over whether a rule of the Exchange can provide the basis for an implied private right of action is far from over, *compare Leist v. Simplot*, 638 F.2d 283, 296 n.11 (1980) (Friendly, J.), *with id.* at 337 n.8 (Mansfield, J., dissenting), we note that the persuasiveness of *Van Gemert* as a precedent in this area may be subject to question on the ground that it was handed down without benefit of the Supreme Court's decision in *Cort v. Ash*, 422 U.S. 66 [95 S.Ct. 2080, 45 L.Ed.2d 264] (1975), which established criteria for implying a private right of action." (footnote omitted). *Id.* 654 F.2d at 852–53.

While the Second Circuit has thus not ruled definitively on the issue of implied private rights of action for violations of NYSE or NASD Rules after the trilogy of Supreme Court decisions, Judge Duffy of this court has apparently concluded that the question must be answered in the negative. In *Klitzman v. Bache Halsey Stuart Shields, Inc.*, 499 F.Supp. 255 [1980] ¶ 97,627 (CCH) (S.D.N.Y.1980), the court held that there is no implied right of action for an NASD Rule violation and dismissed claims predicated on NASD Rules, Sections 1, 2 and 18. The court endorsed the ruling of the Ninth Circuit in *Jablon* that such a conclusion is mandated under the standards set forth in *Touche Ross* and *Transamerica.*

The court also rejected the argument that the Securities Acts Amendments of 1975 ("1975 Act"), 15 U.S.C. § 78a *et seq.*, which conferred upon the SEC the authority to amend the rules of self-regulatory agencies such as the NASD if such rules are inconsistent with the federal securities laws, required the implication of a private right of action under NASD Rules. As to Congressional intent, the primary criterion under *Touche Ross* and *Transamerica*, the court found no legislative intent to create a private cause of action. Judge Duffy based this conclusion upon an examination of the surrounding circumstances and legislative history of the 1975 Act, finding (1) that the Congressional intent was merely to avoid conflicts between self-regulatory rules and the securities laws, (2) that Congress evidenced no intent to disturb a system of self-regulation by rules carrying their own sanctions, and (3) that Congress had been silent on the subject of private actions based upon such rules. As to the other factors to be considered under *Cort v. Ash*, Judge Duffy concluded (1) that the 1975 Act was enacted for the protection of the national economy and not specifically for the benefit of individual investors, and (2) in view of the overall statutory scheme, it is "difficult to imagine" conduct not already actionable under the federal securities laws or the common law. *Id.* 499 F.Supp. 255 [1980] ¶ 97,627 (CCH) at p. 98,375.

█ Given this state of the law, the Court concludes that defendants' motion to dismiss the third and fourth counts of the second amended complaint must be granted. Two independent lines of analysis impel this conclusion.

First, applying the principles set forth in *Cort v. Ash, Touche Ross* and *Transamerica*, I am in agreement with Judge Duffy and the other courts which have specifically addressed the issue that these principles compel the dismissal of private claims based upon alleged violations of NYSE or NASD Rules. The predominant consideration is whether Congress intended to create such a private cause of action. *Touche Ross, supra*, 442 U.S. at 568, 99 S.Ct. at 2485. Here, several factors suggest the absence of such an intent:

(1) the statutory bases for the NYSE and NASD Rules, see 15 U.S.C. §§ 78f(b)(5) and (6) and 78o–3(b)(6) and (7), do not confer any rights or proscribe any conduct by exchange or association members, see *Touche Ross, supra,* at 569, 99 S.Ct. at 2485; *Jablon, supra,* 614 F.2d at 680;

(2) there is apparently no mention of this subject in the legislative history; see *Touche Ross, supra,* 442 U.S. at 571, 99 S.Ct. at 2486; *Klitzman, supra,* 499 F.Supp. 255 [1980] 97,627 (CCH) at ¶ 98,375;

(3) there are several express provisions in the Act creating private remedies under specified circumstances, suggesting that the failure to provide for private actions for violations of exchange or association rules was not an oversight, see, *Transamerica, supra,* 444 U.S. at 19–21, 100 S.Ct. at 247–48; *Touche Ross, supra* 442 U.S. at 571–72, 99 S.Ct. at 2486–87; *Jablon, supra* at 681; and,

(4) the statutory scheme provides for self-regulation and enforcement by exchanges and associations, suggesting that Congress has selected this as the exclusive means of enforcement, see, *Transamerica, supra* 444 U.S. at 20, 100 S.Ct. at 247; *Cort v. Ash, supra,* 422 U.S. at 78, 95 S.Ct. 2088 (third factor); *Klitzman, supra* 499 F.Supp. 255 [1980] 97,627 (CCH) at 98,375.

Colman raises only one argument in an attempt to bring his claims within the ambit of the Court's decisions. He argues that investors such as himself constitute the class for whose especial benefit the statutes and corresponding rules were created, satisfying the first of the four *Cort v. Ash* factors. The argument, which may be presumed to be factually accurate, is of no avail to Colman. The four *Cort v. Ash* factors are not equally significant; where, as here, there is no indication of Congressional intent, the inquiry is ended and there is no need to examine other factors. *Touche Ross, supra* 442 U.S. at 575–76, 99 S.Ct. at 2489. Under these circumstances, that Colman is within the class Congress intended to protect does not warrant the implication of a private right of action for NYSE or NASD Rules violations. *Trans-*

*america, supra* 444 U.S. at 24, 100 S.Ct. at 249.

Second, Counts III and IV of the Second Amended Complaint must be dismissed under the principles set forth in *Colonial.* Colman argues that *Colonial* remains unscathed as the law of this Circuit on the issue before this Court. I disagree. Although neither the Supreme Court nor the Second Circuit has addressed this precise issue, I am in accord with the implicit views of Judge Duffy in *Klitzman* and Judge Mansfield, dissenting in *Leist,* that *Colonial* has been superseded, or at least significantly qualified, by the trio of intervening decisions of the Supreme Court. See also *State Teachers, supra,* 654 F.2d at 852–53 (prior decision allowing private cause of action based upon NYSE Manual subject to question following *Cort v. Ash* ). In any event, as noted, even under the *Colonial* standards, Counts III and IV must be dismissed.

As detailed earlier, *Colonial* places the burden upon Colman to demonstrate that a particular rule plays an integral part in the regulatory scheme. Colman's primary argument in attempted satisfaction of this burden is that since the rules in question are now paralleled by SEC regulations governing broker-dealers not members of registered exchanges or associations, see 17 C.F.R. §§ 240.15b10–2 through 240.15b10–6, this demonstrates the importance of the NYSE and NASD Rules in the overall regulatory scheme. Although *Colonial* preceded the promulgation of these rules (but not the 1964 Amendments to the Act authorizing the promulgation of such rules), Colman's argument in reliance thereon may fairly be said to have been anticipatorily rejected by *Colonial.* The Court in *Colonial* recognized that the rules of registered exchanges and associations "amount to a substitute for regulation by the SEC itself," *id.* at 182, but nevertheless refused to find this a sufficient basis for generally implying private remedies. Rather the Court required a showing that "the particular rule" plays an essential role in the overall system, such a showing to depend largely upon whether the rule imposes a specific obligation not imposed by

government regulation or the common law. The promulgation of similar rules by the SEC has not been viewed as altering this standard. *Plunkett, supra,* 414 F.Supp. at 890 (Newman, J.).

In *Colonial,* the court found that rules which merely proscribe conduct inconsistent with just and equitable principles of trade are too general to satisfy this standard. Courts which have followed *Colonial* have accordingly required that rules contain "precise directives" not otherwise imposed upon broker-dealers before allowing an implied private action. See, *e. g., Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 465 F.Supp. 1233, 1235 (S.D.N.Y.1979). The Rules upon which Colman seeks to predicate claims, see footnote 1, *supra,* do not satisfy this standard.

Turning first to the NASD Rules in question, Section 1, which requires the observation of "high standards of commercial honor and just and equitable principles of trade," was expressly held in *Colonial* not to be a rule upon which an implied private cause of action may be based. Section 2, which generally requires that recommendations be suited to a customer's needs, similarly lacks the requisite precision in defining rights and obligations to satisfy the *Colonial* standard, and adds little or nothing to duties imposed by statute or by the common law, *Plunkett, supra* at 890. Section 18, which prohibits transactions involving "any manipulative, deceptive or other fraudulent device or contrivance," obviously creates no obligation not already imposed by the Act. And Section 27, which requires members to promulgate supervisory procedures regarding its representatives in order to assure compliance with the Act, SEC regulations and NASD Rules, and which provides that final responsibility for proper supervision shall rest with the member, does not in any real sense impose obligations "unknown to the common law" of respondeat superior or to the Act, see Section 20, 15 U.S.C. § 78t. See *Plunkett, supra* at 890.

Turning to the NYSE Rules in question, NYSE Rule 342(b) is similar in purpose and effect to NASD Rules, Section 27, and is

rejected as a basis for an implied private right of action for the same reasons. NYSE Rule 405, which in relevant part requires members to learn all relevant facts regarding their customers and to supervise customer's accounts, similarly imposes only very general obligations which are essentially imposed by the Act and by common law, and is thus an inappropriate basis for the implication of a private right of action. See *Leist, supra,* 638 F.2d at 296 n.11; *Plunkett, supra* at 890. Finally, NYSE Rule 408, the relevant portion of which Colman relies upon because it dovetails with the supervision requirements of other rules, is insufficient for the reasons already discussed.

Accordingly, defendants' motion to dismiss Counts III and IV of the second amended complaint is granted.

Paragraph 22(c) of Count I, however, presents a slightly different question. Count I is predicated upon Rule 10b–5. Paragraph 22(c) lists as one of several alleged material omissions the failure to disclose the violation of Blair's internal rules, apparently created by Blair in compliance with NASD Rules, Section 27.

To the extent, as defendants suggest, that Colman by Paragraph 22(c) seeks to predicate liability upon the noncompliance of defendants with such in-house rules, Paragraph 22(c) does not plead a claim which is cognizable as a private cause of action for the reasons stated above. Since the violation of Section 27, which requires the promulgation of such in-house rules, cannot be the basis of an implied cause of action, it is manifest that the violation of the in-house rules themselves can be no superior basis for a private claim.

The question is whether recasting the claim as "nondisclosure" of the alleged noncompliance with the in-house rules states a claim under Rule 10b–5. The issue must be analyzed in the context of Rule 10b–5's requirement that omissions must be material to be actionable. And the measure of materiality must be the *act* which violates the in-house rule, not the mere fact that an in-house rule has been violated.

To illustrate by example, suppose that a broker-dealer engaged in conduct "X," and that the failure to disclose "X" to the customer is a material omission. Assuming the other requisites of a Rule 10b–5 claim are satisfied, the failure to disclose "X" constitutes a violation of Rule 10b–5. It adds nothing to the claim that "X" is also violative of an in-house rule of the broker-dealer. By contrast, suppose that a broker-dealer engages in conduct "Y," and that the failure to disclose "Y" to the customer is *not* a material omission. Suppose also that "Y" is in violation of the broker-dealer's in-house rules. To allow a Rule 10b–5 claim under these circumstances would permit materiality to turn solely on the existence of the rule regardless of its content. And to allow a nondisclosure claim solely because "Y" is in violation of in-house rules would effectively eradicate the principle that the violation of such rules cannot be the basis for a private cause of action, since in every or virtually every case where a broker-dealer violates such rules it presumably fails to disclose the violations.

In this case, Paragraph 22(c) states only that defendants' failure to disclose their noncompliance with Blair's in-house rules was a material omission. For the reasons stated, that is insufficient to state a claim under Rule 10b–5. If the failure to disclose the *conduct* in question was independently material, Paragraph 22(c) adds nothing to the allegations set forth in other paragraphs in Count I. And if the failure to disclose the conduct was not material—as appears from the fact that Paragraph 22(c) claims the nondisclosure of the rule violation as an independent material omission— Paragraph 22(c) does not state a claim upon which relief may be granted and must accordingly be stricken.[3]

Defendants' motion to dismiss Count III, Count IV and Paragraph 22(c) of Count I in the Second Amended Complaint is accordingly granted.

SO ORDERED.

---

3. In this regard, the Court notes that Paragraph 22(c) alleges only a nondisclosure of the violation of Blair's in-house rules, and does not claim that the rules constituted an affirmative

misrepresentation. In other words, there is no claim that Colman knew of and specifically relied upon the rules in entrusting his portfolio to Blair.