TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-09-00566-CV






David Fernea, Appellant


v.


Merrill Lynch Pierce Fenner & Smith, Inc., Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. D-1-GN-09-002195, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING





O P I N I O N



 Appellant David Fernea sued appellee Merrill Lynch Pierce Fenner & Smith, Inc.
("Merrill Lynch") asserting various causes of action arising from its alleged failure to adequately
supervise its employee, Terry Christopher Bounds, in the sale of a portion of his outside businesses
to Fernea. Merrill Lynch moved for summary judgment, attaching affidavits to its motion as
evidence. Fernea objected to the affidavits on several grounds. The trial court overruled Fernea's
objections and granted summary judgment in favor of Merrill Lynch. In eleven issues, Fernea asserts
that the trial court erred in overruling his objections to Merrill Lynch's summary-judgment affidavits
and in granting summary judgment for Merrill Lynch on each of his claims. We will affirm in part
and reverse and remand in part.


FACTUAL AND PROCEDURAL BACKGROUND

 Bounds is an employee of Merrill Lynch and a licensed securities broker. Bounds
also owned two "outside" direct-marketing corporations that were unrelated to his employment at
Merrill Lynch. Bounds decided to sell his interests in those companies and, according to Fernea,
solicited Fernea to "purchase shares" in the businesses. After negotiation, Fernea agreed to buy a
fifty-percent interest in each company. Fernea alleged that, "[a]fter receiving payment, Bounds
refused to perform his side of the agreement, concealing his actions by delivering a fake stock
certificate for 1000 shares of 'Bounds & Pinto, Inc.,' an illegal, non-existent corporation with a
deceptively similar name [to the companies' actual names]." Fernea asserted that Bounds made
numerous misrepresentations and omissions to induce Fernea to purchase the stock. The alleged
omissions included Bounds's failure to disclose that the stock being sold was not and had never been
registered with the Texas State Securities Board and that Bounds's companies had been the subject
of consumer-protection litigation by the Texas Attorney General. Fernea also contended that Bounds
"secretly and repeatedly attempted to resell to others the same corporations previously sold to
Fernea." Although Fernea and Bounds had become acquainted socially, and Fernea was not a
customer of Merrill Lynch, Fernea asserted that the "relationship between Merrill Lynch and Bounds
was important" to him in deciding to invest in Bounds's companies because he "thought that
[affiliation] . . . would weigh heavily [against] any possible deception on [Bounds's] part."

 The parties dispute the extent of Merrill Lynch's awareness of Bounds's sale to
Fernea. Merrill Lynch admitted that it knew of the attorney general's consumer-protection litigation
and had, as a result, undertaken an investigation of Bounds's outside companies, specifically
inquiring into whether Bounds had met his disclosure responsibilities to Merrill Lynch. Referencing
Merrill Lynch's internal documents and testimony by Bounds, Fernea alleges that "[a]s a part of its
investigation, Merrill Lynch was notified that Bounds intended to sell a portion of his interest in the
corporations." In particular, Fernea points to a "Letter of Education" addressed to Bounds from his
superiors at Merrill Lynch that reprimanded him for failing to accurately report his outside
companies' lines of business. The letter noted that, as a "mitigating factor" in Merrill Lynch's
decision not to take sterner disciplinary action, Bounds had decided to "sell [his] outside business
to devote more time and effort to growing [his] business at the Firm." Fernea asserts that this
document is evidence that "Merrill Lynch knew the corporations were both Sub-C corporations and
knew that Bounds's holdings in the corporations were evidenced by stock." Fernea also alleges that
"[a]lthough Merrill Lynch knew that Bounds was trying to sell his interest in the
corporations--interests held in stock--Merrill Lynch made no attempt to inquire about the sale, its
terms, or the registration of the securities."

 Fernea filed suit against Bounds, Bounds's companies, and Merrill Lynch, seeking
damages and rescission of the transaction. Fernea alleged five causes of action against Merrill
Lynch: (1) violation of section 33 of the Texas Securities Act, the "aider and abettor" liability
provision; (2) violations of several internal rules of the New York Stock Exchange ("NYSE") and
the National Association of Securities Dealers ("NASD"); (3) negligence for violating Merrill
Lynch's internal policies with respect to outside transactions conducted by its employees;
(4) negligent supervision of Bounds with respect to his outside transactions; and (5) "control person"
liability under the Texas Securities Act. (1)

 Merrill Lynch moved for summary judgment, asserting that (1) Fernea could provide
no evidence on several of the elements of aider-and-abettor liability; (2) there is no private right of
action for a violation of NYSE and NASD rules or internal company policies, or, in the alternative,
the evidence conclusively proved that no violations occurred; (3) Merrill Lynch had no duty to
Fernea with respect to a violation of its internal policies, or, in the alternative, the evidence
conclusively proved that no violation occurred; (4) Fernea failed to state a claim for negligent
training and supervision because Merrill Lynch did not owe him a duty and the evidence
conclusively disproved proximate cause; and (5) Merrill Lynch was not liable under the Texas
Securities Act because, as a matter of law, it was not a "control person" as that term is defined in
the statute.

 Fernea objected to portions of the affidavits attached to Merrill Lynch's motion. 
After a hearing, the trial court overruled Fernea's objections and granted summary judgment in favor
of Merrill Lynch on all of Fernea's claims. The court then severed Fernea's claims against Merrill
Lynch from those against the other defendants, making the summary judgment final and appealable
as to Merrill Lynch. Fernea perfected this appeal.


STANDARD OF REVIEW

 Whether summary judgment is proper is a question of law that we review de novo.
FM Props. Operating Co. v. City of Austin, 22 S.W.3d 868, 872 (Tex. 2000). "Traditional"
summary judgment is proper if (1) there are no genuine issues of material fact, and (2) the movant
is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). "If the movant establishes the
right to judgment, the burden shifts to the nonmovant to raise a fact issue that would preclude
summary judgment." Virginia Indonesia Co. v. Harris County Appraisal Dist., 910 S.W.2d 905, 907
(Tex. 1995). A defendant who conclusively negates at least one essential element of a plaintiff's
cause of action is entitled to summary judgment on that claim. IHS Cedars Treatment Ctr. of
DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2003). "When reviewing a summary
judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable
inference and resolve any doubts in the nonmovant's favor." Provident Life & Accident Ins. Co.
v. Knott, 128 S.W.3d 211, 215-16 (Tex. 2003).

 "To prevail on a no-evidence summary-judgment motion, a movant must allege that
there is no evidence of an essential element of the adverse party's claim." Southwest Elec. Power
Co. v. Grant, 73 S.W.3d 211, 215 (Tex. 2002) (citing Tex. R. Civ. P. 166a(i)). The burden then
shifts to the nonmovant to produce more than a scintilla of probative evidence to support each
challenged element of its claims. Forbes, Inc. v. Granada Biosciences, 124 S.W.3d 167, 172 (Tex.
2003). More than a scintilla of evidence exists when reasonable and fair-minded people could differ
in their conclusions based on the evidence in the record. Id.; see also Ford Motor Co. v. Ridgway,
135 S.W.3d 598, 601 (Tex. 2004) ("When the evidence offered to prove a vital fact is so weak as
to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than
a scintilla and, in legal effect, is no evidence." (quoting Kindred v. Con/Chem, Inc., 650 S.W.2d 61,
63 (Tex. 1983))). "Both direct and circumstantial evidence may be used to establish any material
fact." Ford Motor Co., 135 S.W.3d at 601. "To raise a genuine issue of material fact, however, the
evidence must transcend mere suspicion. . . . Evidence that is so slight as to make any inference a
guess is in legal effect no evidence." Id. We review "the evidence . . . in the light most favorable
to the non-movant." Id.


DISCUSSION

No-Evidence Summary Judgment Generally

 We begin by addressing Fernea's eleventh issue, in which he asserts in general terms
that the trial court erred in granting Merrill Lynch's no-evidence motion. Although the parties
briefed this appeal as if Merrill Lynch had properly sought both traditional and no-evidence summary
judgment on each of Fernea's claims, a review of the motion shows that Merrill Lynch asserted a
proper no-evidence motion only as to Fernea's aider-and-abettor claim under the Texas Securities
Act. Although Merrill Lynch's motion also stated that "[t]here has been adequate time for discovery,
and there is no evidence of one or more essential elements of the Plaintiff's causes of action against
Merrill Lynch," such a statement does not, by itself, meet the requirements of a no-evidence motion
for summary judgment. See Tex. R. Civ. P. 166a(i) ("The motion must state the elements as to
which there is no evidence."); Dibco Underground, Inc. v. JCF Bridge & Concrete, Inc.,
No. 03-09-00255-CV, 2010 WL 1413071, at *6 (Tex. App.--Austin Apr. 8, 2010, no pet.) (mem.
op.) (movant's motion must clearly set out specific no-evidence challenge to elements of each cause
of action). Except as to the aider-and-abettor claim, therefore, we consider only whether
"traditional" summary judgment was proper as to Fernea's causes of action and need not address
Fernea's eleventh issue.


Violation of NASD and NYSE Rules (2)

 In his first two issues, Fernea asserts that the trial court erred in granting summary
judgment on his claim that Merrill Lynch violated three securities-industry rules--two promulgated
by the NASD and one by the NYSE. He argues that he is entitled to bring a private cause of action
against Merrill Lynch for its alleged violations and that a fact question exists as to whether Merrill
Lynch violated the rules in question. (3) In its motion for summary judgment, Merrill Lynch argued
that Congress did not intend to create a private cause of action for a violation of NASD and NYSE 
rules or, in the alternative, that its evidence conclusively proved that no violation took place.

 (i) Private Cause of Action

 The San Antonio Court of Appeals is the only Texas appellate court that has
addressed whether there is a private cause of action for violation of securities-industry rules. Relying
on a federal district court opinion from the Southern District of Texas, and without further
discussion, the court of appeals held that "there is no independent cause of action for NASD
violations." Milan v. Dean Witter Reynolds, Inc., 90 S.W.3d 760, 767 (Tex. App.--San Antonio
2002, pet. denied) (citing Porter v. Shearson Lehman Bros., Inc., 802 F. Supp. 41, 63 (S.D. Tex.
1992)). The Fifth Circuit has not addressed the issue, see Lang v. French, 154 F.3d 217, 222 n.26
(5th Cir. 1998), and federal district courts in Texas are split, compare Cook v. Goldman, Sachs
& Co., 726 F. Supp. 151, 156 (S.D. Tex. 1989) (implied private cause of action exists), with Porter,
802 F. Supp. at 63 (implied private cause of action does not exist), and Lange v. H. Hentz & Co.,
418 F. Supp. 1376, 1383 (N.D. Tex. 1976) (same).

 Fernea relies on two cases to support his assertion that Congress intended to create
a private cause of action: Buttery v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 410 F.2d 135, 142
(7th Cir. 1969), and Cook, 726 F. Supp. at 156. The great weight of authority, however, holds
against inferring a private cause of action for violations of NASD and NYSE rules. We find the
cases Fernea cites for the opposite view unpersuasive. Buttery, a Seventh Circuit case, was decided
prior to three key Supreme Court decisions setting forth the test for implying statutorily based private
causes of action. See Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 15 (1979) ("The
question whether a statute creates a cause of action, either expressly or by implication, is basically
a matter of statutory construction."); Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979)
("As we recently have emphasized, the fact that a federal statute has been violated and some person
harmed does not automatically give rise to a private cause of action in favor of that person. Instead,
our task is limited solely to determining whether Congress intended to create the private right of
action." (internal quotation marks omitted)); Cort v. Ash, 422 U.S. 66, 78 (1975) (establishing
four-factor test later compressed and refined by Touche Ross and Transamerica). Despite being
handed down a decade after Transamerica, Cook, a Texas federal district court opinion, relied
heavily on Buttery, its progeny, and other cases that pre-date Cort. The Cook court did not discuss
whether Buttery was still good authority considering that Transamerica largely rejected the test that
the Buttery court had employed. See Transamerica, 444 U.S. at 15-16 ("While some opinions of the
Court have placed considerable emphasis upon the desirability of implying private rights of action
in order to provide remedies thought to effectuate the purposes of a given statute, what must
ultimately be determined is whether Congress intended to create the private remedy asserted, as our
recent decisions have made clear."). Thus, like Buttery, Cook's authority is questionable.

 Post-Transamerica decisions employing that case's reasoning consistently hold that
Congress did not intend to create a private cause of action for violations of self-regulating
organizations' rules. See, e.g., In re Verifone Sec. Litig., 11 F.3d 865, 870 (9th Cir. 1993)
(dismissing claims for violations of NASD and NYSE rules because "[i]t is well established that
violations of an exchange rule will not support a private claim"); Hosworth v. Blinder, Robinson
& Co., 903 F.2d 186, 200 (3rd Cir. 1990) (no private right of action for violation of NASD rules);
Craighead v. E.F. Hutton & Co., 899 F.2d 485, 493 (6th Cir. 1990) (same); Thompson v. Smith
Barney, Harris Upham & Co., 709 F.2d 1413, 1419 (11th Cir. 1983) (same); Jablon v. Dean Witter
& Co., 614 F.2d 677, 681 (9th Cir. 1980) ("Based upon the standards in Touche Ross and
Transamerica, we conclude there is no implied right of action for an NASD rule violation."); Porter,
802 F. Supp. at 63; Emmons v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 532F. Supp. 480
(S.D. Ohio 1982) (under Cort, no implied right of action under NYSE or NASD rules); Klitzman
v. Bache Halsey, 499 F. Supp. 255 (S.D.N.Y. 1980) (no private right of action under NASD rules). 
Even the NASD's own arbitration panel has recognized that no private cause of action exists for
violating its rules. See Penzer v. Advest, Inc., No. 92-00400, 1993 WL 603507, at *5 (NASD
Nov. 5, 1993) ("[C]ase law supports the conclusion that no private right of action exists for breach
of NASD rules." (citing SSH Co. v. Shearson Lehman Bros., Inc., 678 F. Supp. 1055, 1058
(S.D.N.Y. 1987))).

 We agree. Although we need not revisit here the detailed analyses performed in the
cases cited above, we will briefly summarize them. The relevant inquiry is to determine whether
Congress intended to create a private cause of action for a violation of NASD and NYSE rules in the
Securities and Exchange Act of 1934 by employing the usual rules of statutory construction. See
Transamerica, 444 U.S. at 15; Jablon, 614 F.2d at 681; see also Touche Ross, 442 U.S. at 568
(describing inquiry in determining Congressional intent). As the Jablon court and others have noted,
Congress specifically provided for private causes of action for violations of some securities rules,
yet did not provide a cause of action for violations of NASD and NYSE rules. See Jablon, 614 F.2d
at 681. Accordingly, we conclude that Congress did not intend to create a private right of action
here. Id. at 680-81; see also Touche Ross, 442 U.S. at 568 ("The source of plaintiffs' [private right
of action] must be found, if at all, in the substantive provisions of the 1934 Act which they seek
to enforce . . . .").

 Because there is no private cause of action for violation of NYSE and NASD rules,
the trial court did not err in granting summary judgment in favor of Merrill Lynch as to that claim. 
We overrule Fernea's first and second issues.


Negligence Claim for Violation of Merrill Lynch's Internal Company Policies

 In his third issue, Fernea asserts that the trial court erred in granting summary
judgment on his claim that Merrill Lynch negligently breached its internal policies "when the
evidence showed that [Merrill Lynch] had received the notice to trigger its duties under its policies." 
Fernea asserts that Merrill Lynch had a legal duty under its policies to monitor Bounds's outside
business activities for the protection of the investing public once it undertook to adopt those policies. 
Although the general rule is that, outside of certain special relationships, the law imposes no duty
to take action to prevent harm to another, Fernea premises the existence of such a legal duty here on
the "voluntary-undertaking" exception. Merrill Lynch argues that it owed no duty to Fernea as a
matter of law or, alternatively, that it presented conclusive evidence that it complied with its internal
company policies.

 A cause of action for negligence arises when an actor breaches a legal duty and the
breach proximately causes damages. Columbia Med. Ctr. of Las Colinas, Inc. v. Hogue,
271 S.W.3d 238, 246 (Tex. 2008). Whether a legal duty exists is a question of law. Trammell Crow
Cent. Tex., Ltd. v. Gutierrez, 267 S.W.3d 9, 12 (Tex. 2008). "Texas law generally imposes no duty
to take action to prevent harm to others absent certain special relationships or circumstances." 
Torrington Co. v. Stutzman, 46 S.W.3d 829, 837 (Tex. 2000). The supreme court has recognized,
however, that "a duty to use reasonable care may arise when a person undertakes to provide services
to another, either gratuitously or for compensation." Id.; see also Carter v. Abbyad, 299 S.W.3d 892,
895 (Tex. App.--Austin 2009, no pet.) ("A party who agrees to attempt to help someone else has
a duty to provide that help without negligently harming the person in need."); Keightley v. Republic
Ins. Co., 946 S.W.2d 124, 129 (Tex. App.--Austin 1997, no writ) ("[T]he law places a duty of
ordinary care upon any person who voluntarily enters upon an affirmative course of action affecting
another's interest."). "A person's duty to exercise reasonable care in performing a voluntarily
assumed undertaking is limited to that undertaking." Torrington Co., 46 S.W.3d at 837 (quoting
Fort Bend County Drainage Dist. v. Sbrusch, 818 S.W.2d 392, 397 (Tex. 1991)).

 The supreme court has cited the voluntary-undertaking test articulated in section
323 of the Restatement (Second) of Torts:


One who undertakes, gratuitously or for consideration, to render services to another
which he should recognize as necessary for the protection of the other's person or
things, is subject to liability to the other for physical harm resulting from his failure
to exercise reasonable care to perform his undertaking, if


 (a) his failure to exercise such care increases the risk of such harm, or


 (b) the harm is suffered because of the other's reliance upon the
undertaking.



Id. at 838 (quoting Restatement (Second) of Torts § 323 (1965)). Although it has been debated
whether the supreme court has actually adopted this section of the Restatement, see Texas Farm
Bureau Ins. Co. v. Sears, 54 S.W.3d 361, 368 (Tex. App.--Waco 2001), rev'd on other grounds,
84 S.W.3d 604 (Tex. 2002), the elements of the test the court has applied are substantially similar. 
To hold a defendant liable for negligence under a voluntary-undertaking theory, the plaintiff must
establish that (1) the defendant voluntarily undertook to perform services that it knew or should have
known were necessary for the plaintiff's protection, (2) the defendant failed to exercise reasonable
care in performing those services, and either (3) the plaintiff relied upon the defendant's performance
or (4) the defendant's performance increased the plaintiff's risk of harm. Torrington Co.,
46 S.W.3d at 838-39.

 Fernea asserts that the voluntary undertaking in question was Merrill Lynch's
adoption of internal procedures regarding employee-owned outside interests. He asserts that Merrill
Lynch's duty arises from its voluntary adoption of measures designed to protect members of the
public, like Fernea, who transact business with Merrill Lynch brokers acting outside the scope of
their business with the firm.

 As to reliance, there is no indication that Fernea was even aware of the existence of
Merrill Lynch's internal company policies, much less that he relied on such policies. As to risk
of harm, we conclude that Merrill Lynch's adopting a set of internal operating policies and
procedures did not, without more, increase the risk of harm to Fernea. Although the contours of the
voluntary-undertaking doctrine are not clearly defined, voluntarily undertaking to render services
requires, at a minimum, that an actor take some active step directed toward a
third person--something more than merely enacting general guidelines. Cf. id. at 839 (manufacturer
of helicopter rotor bearings undertook voluntary efforts to investigate helicopter accident and
allegedly provided negligently incomplete information about scope of problem to customers);
Colonial Sav. Ass'n v. Taylor, 544 S.W.2d 116, 119 (Tex. 1976) (lender voluntarily undertook action
to insure borrower's property and did so negligently); Willowbrook Foods, Inc. v. Grinnell Corp.,
147 S.W.3d 492, 499 (Tex. App.--San Antonio 2004, pet. denied) (affirming summary judgment
because plaintiff provided no evidence that third-party finance company, which knew of product
defect, voluntarily undertook to inform plaintiff of that defect before purchase). Here, there is no
nexus between Merrill Lynch's voluntary undertaking--i.e., the adoption of its policies--and its
alleged negligence. That is, Fernea does not allege that Merrill Lynch negligently adopted its
policies. Rather, he asserts that Merrill Lynch was negligent in later failing to follow them. To fall
within the voluntary-undertaking exception, however, the plaintiff must allege that the defendant's
negligence occurred in performing the undertaking itself. Torrington Co., 46 S.W.3d at 838-39. 
Thus, to recover here, Fernea needed to allege that Merrill Lynch was negligent in
adopting its policies, not in later failing to carry them out. Consequently, even assuming that
Merrill Lynch negligently failed to follow its policies, it cannot be liable to Fernea under the
voluntary-undertaking doctrine. (4)

 We hold that Merrill Lynch's adoption of policies and procedures did not itself
increase the risk of harm to Fernea and therefore did not create a duty to Fernea under the
voluntary-undertaking exception to the no-duty rule. Thus, the trial court did not err in granting
summary judgment in favor of Merrill Lynch on Fernea's claim for negligence in violating Merrill
Lynch's internal company policies. We overrule Fernea's third issue.


Negligent Supervision (5)

 Before addressing Fernea's fourth and fifth issues, we turn to his sixth, in which he
asserts that the trial court erred in granting summary judgment in favor of Merrill Lynch on his claim
for negligent supervision. Fernea asserts that Merrill Lynch owed him a duty to supervise Bounds
because Fernea was "a member of the general public" and, more specifically, a member of "the
investing public." He asserts that his injury, economic harm stemming from alleged securities fraud,
"is precisely the type of harm by one of its investment advisors that would be foreseeable to Merrill
Lynch." Citing NASD rules, he argues that Merrill Lynch had the authority and the duty to supervise
Bounds in this transaction. Merrill Lynch argues that Fernea's negligent-supervision claim fails
because (1) Merrill Lynch did not owe Fernea a duty; (2) there was no connection between the
damages Fernea suffered and Bounds's employment with Merrill Lynch; (3) Fernea cannot establish
the element of proximate causation; and (4) the evidence shows that Merrill Lynch properly
supervised Bounds.

 As discussed above, a cause of action for negligence arises when an actor breaches
a legal duty and the breach proximately causes damages. Hogue, 271 S.W.3d at 246. Although the
Texas Supreme Court has "not ruled definitively on the existence, elements, and scope of such torts
. . . as negligent training and hiring," see Waffle House, Inc. v. Williams, 313 S.W.3d 796, 804 n.27
(Tex. 2010), this Court and other courts of appeals have held that the law imposes a duty on an
employer under certain circumstances to use reasonable care in hiring, training, and supervising its
employees, see Houser v. Smith, 968 S.W.2d 542, 544 (Tex. App.--Austin 1998, no pet.). (6)

 "While the employee need not be acting in the scope of his employment to impose
liability on the employer, the theory of negligent hiring and supervision does require that a plaintiff's
harm be the result of the employment." Id. Stated another way, "[t]he employer-employee
relationship . . . may create a duty to a third party only if the third party's harm is brought about by
reason of the employment and is, in some manner, job-related." (7) Capece v. Navisite, Inc.,
No. 03-02-00113-CV, 2002 WL 31769032, at *4 (Tex. App.--Austin Dec. 12, 2002, no pet.) (mem.
op.); see also Guidry v. National Freight, Inc., 944 S.W.2d 807, 809 (Tex. App.--Austin 1997,
no writ).

 This "nexus" requirement has also been stated in terms of proximate cause. See
LaBella v. Charlie Thomas, Inc., 942 S.W.2d 127, 137 (Tex. App.--Amarillo 1997, writ denied)
("[T]he negligence in [hiring, training, or supervising] must be the proximate cause of the injuries
to the plaintiff."); Robertson v. Church of God, Int'l, 978 S.W.2d 120, 125 (Tex. App.--Tyler 1997,
pet. denied) (same). Courts discuss the nexus requirement in terms of both duty and proximate cause
because the requirement is, at its core, one of foreseeability, and foreseeability is an essential
component of both proximate cause and duty. Mellon Mortg. Co. v. Holder, 5 S.W.3d 654, 659
(Tex. 1999) ("The questions of duty and proximate cause are often used in a confused and
overlapping way because both rest on a determination of foreseeability." (internal quotation marks
omitted)). The nexus requirement limits an employer's liability to prevent an employer from
becoming "an insurer of the safety of every person who happens to come into contact with his
employee simply because of his status as an employee." Houser, 968 S.W.2d at 544 (internal
quotation marks omitted); see LaBella, 942 S.W.2d at 137.

 Fernea asserts that Merrill Lynch's duty to him arose as a result of NASD rules that,
according to Fernea, defined Merrill Lynch's duty to supervise Bounds. Assuming without deciding
that NASD rules defined Merrill Lynch's duty to Fernea under Texas negligence law, see Lange,
418 F. Supp. at 1383 ("[R]ules of this sort have served as bench marks for a determination of the
reasonableness of a defendant's actions."), nonetheless Merrill Lynch's evidence conclusively
established that it did not have sufficient notice of the transaction to trigger the supervisory duty at
issue in the present case.

 Fernea cites NASD Rules 3030 and 3040 as relevant here. Rule 3030 states:


No person associated with a member in any registered capacity shall be employed by,
or accept compensation from, any other person as a result of any business activity,
other than a passive investment, outside the scope of his relationship with his
employer firm, unless he has provided prompt written notice to the member. Such
notice shall be in the form required by the member. Activities subject to the
requirements of Rule 3040 shall be exempted from this requirement.


NASD Rule 3030. The plain language of that rule does not impose a duty on Merrill Lynch; rather,
it imposes a duty on Bounds to disclose his outside interests to the firm. As such, it does not, by
itself, support a negligence claim against Merrill Lynch.

 Rule 3040 prohibits any person--e.g., Bounds--"associated with [an NASD]
member"--e.g., Merrill Lynch--from participating in a private securities transaction "except in
accordance with the requirements of this Rule." Id. R. 3040(a). A private securities transaction is
defined as "any securities transaction outside the regular course or scope of an associated person's
employment with a member." Id. R. 3040(e)(1). Because the securities in a private transaction are
sold "away" from the member firm--i.e., not as part of the member's business--these sales are often
called "selling away" transactions and are disfavored because of a heightened potential for fraud. 
Thus, rule 3040 prohibits selling away unless such a transaction is conducted "in accordance with
the requirements of this Rule." The rule requires that if, as here, a security is sold for compensation,
the associated person is required to give written notice to the member "describing in detail the
proposed transaction and the person's proposed role therein and stating whether [the associated
person] has received or may receive selling compensation in connection with this transaction." After
receiving notice, the member must either approve or disapprove of the outside transaction in writing. 
Id. R. 3040(b)-(c). If it disapproves of the transaction, the associated person may not "participate
in the transaction in any matter, directly or indirectly." Id. R. 3040(c)(3). If it approves the
transaction, the member is required to record the transaction on its books and "supervise the person's
participation in the transaction as if the transaction were executed on behalf of the member." 
Id. R. 3040(c)(2).

 Merrill Lynch argues that its summary-judgment evidence conclusively established
that it did not receive sufficient notice of Bounds's transaction with Fernea to trigger its supervisory
duty under rule 3040, and thus it owed no duty to Fernea. As evidence, it presented affidavit and
deposition testimony from Bounds and Charlotte Logann, Merrill Lynch's Austin-area Business
Administrative Manager, who also served as the local compliance officer.

 As Fernea correctly notes, both Logann and Bounds are interested witnesses because
they are Merrill Lynch employees. Nonetheless, rule 166a states that "[a] summary judgment may
be based on the uncontroverted testimonial evidence of an interested witness . . . if the evidence is
clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and
could have been readily controverted." Tex. R. Civ. P. 166a(c). Fernea asserts that the affidavit
testimony of Bounds and Logann fails to conclusively prove lack of notice because (1) the testimony
has been controverted by Merrill Lynch's documentary evidence and by the witnesses' own
testimony; (2) the testimony is "not clear, positive, and direct, or free of contradictions"; and (3) the
underlying issue of fact--whether notice was given--cannot be readily controverted because Merrill
Lynch "has sole possession of its documentation, and has objected to discovery related to this issue
on the basis of attorney/client privilege."

 We agree with Fernea that Bounds's affidavit testimony cannot be used to support
summary judgment for Merrill Lynch. Fernea's testimony regarding Bounds's allegedly fraudulent
conduct casts doubt on Bounds's general credibility as a witness. Thus, we conclude that his
testimony is not the "otherwise credible" evidence of an interested witness that is required to support
summary judgment. See Tex. R. Civ. P. 166a(c).

 Logann's testimony, however, is a different matter. Logann, on behalf of Merrill
Lynch, averred that the company never received notice of the transaction between Bounds and
Fernea. She stated that, in late 2005, Bounds "informed Merrill Lynch verbally that he had decided
to sell his outside businesses." She testified by affidavit that Bounds "occasionally mentioned to
[her] that he was still in the process of selling his business, or that he thought he might have a good
prospect for the sale. He never revealed any more detailed information than that." Logann also
stated that "Bounds never gave Merrill Lynch written notice of any kind regarding the sale [to
Fernea]," and that "Bounds never gave Merrill Lynch written notice that he intended to engage in
any activity that might constitute a private securities transaction under NASD Conduct Rule 3040." 
Logann stated that, before the lawsuit, she had no knowledge that Bounds had actually
consummated a sale, sold only a portion of his businesses, sold them to Fernea, or prepared a stock
certificate in connection with that transaction. Logann's deposition testimony as to these facts is
substantially similar.


 (i) Fernea's Objections to Logann's Affidavit

 Before we address Fernea's assertions that Logann's testimony is contradicted by
other evidence, we must consider his seventh through tenth issues in which he asserts that the trial
court erred in overruling his objections to Bounds's and Logann's summary-judgment affidavits. 
Because we have already determined that Bounds's testimony is insufficient to stand as conclusive
interested-witness summary-judgment evidence, we will limit our discussion to Logann's affidavit.

 We review the trial court's evidentiary rulings for an abuse of discretion. 
Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex. 2000). "A trial court 'abuses its
discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear
and prejudicial error of law.'" BMC Software Belg., N.V. v. Marchand, 83 S.W.3d 789, 800
(Tex. 2002) (quoting Johnson v. Fourth Court of Appeals, 700 S.W.2d 916, 917 (Tex. 1985)). 
Moreover, "[u]nless the trial court's erroneous evidentiary ruling probably caused the rendition of
an improper judgment, we will not reverse the ruling." Owens-Corning Fiberglas Corp. v. Malone,
972 S.W.2d 35, 43 (Tex. 1998).

 Fernea objected to Logann's entire affidavit, and specifically to paragraphs
12, 13, 14, 18, and 20, as not based on personal knowledge. Fernea asserts that Logann testified in
her deposition that she "played no role in drafting the contents of her affidavit and that Merrill
Lynch's lawyer was in charge of what was contained in it." He also asserts that Logann testified that
she "lacked enough personal knowledge 'to get her through a conversation sometimes.'" He argues
that Logann's deposition testimony casts into doubt whether she had any personal knowledge of the
facts in her affidavit, and thus renders her affidavit testimony incompetent. We agree, but only as
to paragraphs 14 and 18.

 Logann testified as a representative of Merrill Lynch. An individual's position or job
responsibilities can qualify her to testify to facts she learns through her actions and responsibilities
at her company. Equisource Realty Corp. v. Crown Life Ins. Co., 854 S.W.2d 691, 695 (Tex.
App.--Dallas 1993, no writ) (personal knowledge may be established by person's position within
company). A corporate employee is generally presumed to possess personal knowledge of facts that
she would learn in the usual course of her employment without having to otherwise prove personal
knowledge. See id.; see also Miller v. Raytheon Aircraft Co., 229 S.W.3d 358, 365-66 (Tex.
App.--Houston [1st Dist.] 2007, no pet.) (absent evidence to contrary, affiant's personal knowledge
of corporate employment matters assumed because of his position as vice president of finance);
Nortex Drug Distrib., Inc. v. Sunset Trails, Inc., No. 05-98-00676-CV, 2000 WL 1230766, at *5
(Tex. App.--Dallas Aug. 31, 2000, no pet.) (mem. op.) (president of company assumed to have
personal knowledge of high-level contract negotiations because of his position with company). 
Thus, absent indications to the contrary, Logann is presumed to possess personal knowledge of facts
within the scope of her job as the Austin compliance officer for Merrill Lynch. Moreover,
Logann testified that the information in her affidavit, which was drafted by her lawyer, came from
"attorney-client conversations" that she had with the lawyer. She also testified that she reviewed the
affidavit and made several changes before signing it, and that her affidavit testimony was her own
and was accurate. As to paragraphs 14 and 18, (8) however, Logann admitted having limited personal
knowledge. In light of such an admission, it was arguably an abuse of discretion to overrule Fernea's
objections to those two paragraphs. Any error, however, was harmless because removing paragraphs
14 and 18 does not affect the strength of Logann's testimony that Merrill Lynch never received
written notice from Bounds giving details of his sale of securities to Fernea.

 Fernea also objected to various portions of Logann's affidavit as conclusory or
unsupported by documentary evidence. He also objected to the court's allowing Logann to amend
her affidavit to correct an improperly made authentication of its exhibits. We need not address these
objections because Fernea does not object (other than for lack of personal knowledge) to the portions
of Logann's testimony that would affect her testimony regarding a lack of notice. Thus, assuming
without deciding that the court erred and should have struck the offending paragraphs, any such error
would have been harmless for the same reason discussed above.


 (ii) Logann's Affidavit

 Substantively, Fernea asserts that Logann's statements concerning Merrill Lynch's
lack of notice under rule 3040 are inconsistent with her later testimony and various documents
showing that she knew Bounds was preparing to sell his outside businesses and that he held his
business in stock. We disagree. Merrill Lynch does not dispute that it knew, at some point in
late 2005, that Bounds was planning to sell his businesses. Such knowledge, however, is not
inconsistent with Logann's testimony that Merrill Lynch never received detailed written notice about
Bounds's eventual sale of securities to Fernea.

 Fernea asserts that Bounds's affidavit testimony contradicts Logann's and creates a
fact question as to whether Bounds gave Merrill Lynch the required written notice. Fernea relies on
the following statements from Bounds's affidavit: "At no time did any of this transaction involve
Merrill Lynch or anything to do with my employment at Merrill Lynch. The anticipated listing and
sale of my outside interests was disclosed by me to Merrill Lynch as required." (Emphasis added.) 
Fernea asserts that, because we must construe all reasonable inferences in his favor, we must assume
that when Bounds said he disclosed his "anticipated listing and sale . . . as required" what he really
meant was that he gave Merrill Lynch the detailed written notice of an impending selling-away
transaction required by rule 3040 to impose on Merrill Lynch a duty to supervise the transaction. 
Considering the vagueness of the statement itself and the context in which it appears, however, we
conclude that it gives rise to no more than a suspicion or surmise that Bounds gave Merrill Lynch
detailed written notice of his securities sale to Fernea. See Ford Motor Co., 135 S.W.3d at 601
(suspicion or surmise of existence of fact is no more than scintilla of evidence). Viewed in context,
this is particularly clear. Bounds's affidavit states that he did not know he was selling a security, and
that "the stock certificate was never considered by Mr. Fernea or me to represent an official or
registered security." He then discusses that his outside companies did not benefit from the sale and
that Merrill Lynch had nothing to do with the sale. It would not be a reasonable inference to read
Bounds's statement that he disclosed the "anticipated listing and sale" of his outside businesses to
mean that, despite the fact that he was unaware that he was selling securities, he gave Merrill Lynch
detailed notice that he was selling securities to Fernea, especially as the parties agree that Bounds
gave Merrill Lynch notice in late 2005 that he anticipated selling his outside companies.

 Finally, Fernea asserts that he is unable to present contradictory documentary
evidence because Merrill Lynch withheld such evidence under the guise of attorney-client privilege. 
But Fernea did not move to compel production of the documents in question despite sufficient
opportunity to do so. Without availing himself of the mechanisms at his disposal to acquire the
evidence he sought, he cannot now assert that its absence is grounds for reversal.


 (iii) Conclusion

 We hold that Merrill Lynch conclusively established that it did not receive the
detailed written notice required by rule 3040 to trigger its duty to supervise Bounds's outside
business sale under NASD rules. Consequently, it has conclusively negated the duty element of
Fernea's claim for negligent supervision. Having conclusively negated an element of Fernea's claim,
Merrill Lynch was entitled to summary judgment on that claim. We overrule Fernea's sixth issue. 
Also, because any error in the trial court's overruling of Fernea's objections to Merrill Lynch's
affidavits was harmless, we overrule his seventh through tenth issues.


Aider-and-Abettor Liability

 In his fourth issue, Fernea asserts that the trial court erred in granting summary
judgment on his claim that Merrill Lynch violated section 2 of article 33(F) of the Texas Securities
Act, which imposes joint and several liability on aiders and abettors in fraudulent securities
transactions. That section states:


A person who directly or indirectly with intent to deceive or defraud or with reckless
disregard for the truth or the law materially aids a seller, buyer, or issuer of a security
is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer,
or issuer, and to the same extent as if he were the seller, buyer, or issuer.



Tex. Rev. Civ. Stat. Ann. art. 581-33F § 2 (West Supp. 2009). To prove aider-and-abettor liability,
the plaintiff must demonstrate:


(1) that a primary violation of the securities laws occurred; (2) that the alleged aider
had "general awareness" of its role in this violation; (3) that the actor rendered
"substantial assistance" in this violation; and (4) that the alleged aider either (a)
intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the
representations made by the primary violator.



Frank v. Bear, Stearns & Co., 11 S.W.3d 380, 384 (Tex. App.--Houston [14th Dist.] 2000, pet.
denied); see also In re Enron Corp. Sec., Derivative & ERISA Litig., 235 F. Supp. 2d 549, 568
(S.D. Tex. 2002). Merrill Lynch asserts that Fernea has no evidence of three elements: general
awareness, assistance, and either of the two possible culpable mental states.


 (i) General Awareness

 The parties agree that the alleged "primary violation" here is Bounds's sale of
unregistered securities to Fernea. Merrill Lynch asserts that it had no awareness of Bounds's sale
of those securities to Fernea or that such securities were unregistered. Fernea asserts that "Merrill
Lynch had 'general awareness' of the transaction [because it] knew that Bounds had engaged in a
sale of securities, as evidenced by the testimony of [two Merrill Lynch representatives], and by the
letter of education."

 In addition to the letter of education, which we discussed in more detail in the facts
section above, Fernea cites the following testimony from Logann and Kent Varner, the Director of
Merrill Lynch's Austin "Capitol Complex" where Bounds worked. Logann testified:


Q. Do you know how in [the letter of education] this sentence was added,
"Additionally, management has also considered your decision to sell your
outside business to devote more time and effort to growing your business at
the firm?" How did that end up in the letter? Do you know?


A. No. That could have come from conversations with the attorneys and Chris
Bounds.


. . . .


Q. I just--what we do know is that somebody, at least, was notified of
[Bounds's] intent to sell [his companies].


A. Yes. Mr. Bounds notified them that he wanted to sell his companies.


. . . .


Q. You mention that when Mr. Bounds--after this investigation was started--or
after this attorney general investigation that ended in the letter of education
dated December 30, 2005--are you with me?


A. Yes.


Q. After that, Mr. Bounds notified you he was selling his business interests,
correct?


A. Well, yes. Verbally.



Fernea also points to Logann's deposition testimony where she states that she learned in "November
or December"--presumably 2006--that Bounds "sold a piece [of his company], not half, but just
a portion of [sic] whatever that meant."

 Mr. Varner testified:


Q. Ms. Logann made a comment [in her deposition] at one point that we knew
of the transaction, and I asked what--who "we" was referring to. Do you
recall the question?


A. I do.


Q. And she said that the "we" referred to you and she and Mr. Bounds. Correct?


A. So the transaction, meaning what?


Q. The sale to David Fernea.


A. I am aware that--I was aware that--that Mr. Bounds was attempting to sell
his business.


Q. Okay. How did you become aware of that?


A. Through both Ms. Logann and from Chris Bounds himself.


Q. Okay. When you--when did you learn that?


A. I don't recall the specific timeline on that.


Q. Can you give me a year?


A. Probably '06.



 Reviewing this testimony and the letter of education in the light most favorable to
Fernea and indulging all reasonable inferences in his favor, we conclude that, although the evidence
could lead a reasonable fact finder to conclude that Merrill Lynch had a general awareness that
Bounds was trying to sell his companies, it does not create more than a mere suspicion or surmise
that Merrill Lynch knew of this specific transaction with Fernea. And, more importantly, it does not
give rise to more than a mere suspicion that Merrill Lynch had "a general awareness of its role in the
violation"--i.e., the actual sale of unregistered securities to Fernea. See Frank, 11 S.W.3d at 384. 
Logann testified that she discovered at some point that Bounds "sold a piece [of his companies], not
half, but just a portion" of them. Far from giving rise to a reasonable inference that Merrill Lynch
had a general awareness about the violation before it happened, her testimony is consistent with a
conclusion that Merrill Lynch did not become aware of the violation itself until after it had taken
place. Likewise, Varner's testimony and the letter of education, which Varner approved and signed,
merely support a conclusion that, at some point prior to Bounds's sale to Fernea, Merrill Lynch had
knowledge that Bounds was attempting to sell his companies. That testimony would not allow a
reasonable fact finder to conclude that Merrill Lynch had awareness about the nature of the specific
transaction at issue here, much less that the sale was conducted illegally.

 We conclude that Fernea presented no more than a scintilla of evidence as to the
general-awareness element of the aider-and-abettor test. Therefore, the trial court did not err in
granting summary judgment in favor of Merrill Lynch on this claim. We need not discuss whether
the record contains evidence supporting the other challenged elements of aider-and-abettor liability. 
We overrule Fernea's fourth issue.


"Control Person" Liability

 In his fifth issue, Fernea asserts that the trial court erred in granting summary
judgment in favor of Merrill Lynch on his claim that Merrill Lynch was liable as a control person
of Bounds under section 1 of article 33F of the Texas Securities Act. (9) That section states:


A person who directly or indirectly controls a seller, buyer, or issuer of a security is
liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or
issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the
controlling person sustains the burden of proof that he did not know, and in the
exercise of reasonable care could not have known, of the existence of the facts by
reason of which the liability is alleged to exist.



Tex. Rev. Civ. Stat. Ann. art. 581-33F § 1 (West Supp. 2009). The Act does not define "control
person," but the word "control"


"is used in the same broad sense as in federal securities law" and means "the
possession, direct or indirect, of the power to direct or cause the direction of the
management or policies of a person, whether through the ownership of voting
securities, by contract, or otherwise."



Barnes v. SWS Fin. Servs. Inc., 97 S.W.3d 759, 763 (Tex. App.--Dallas 2003, no pet.) (quoting Tex.
Rev. Civ. Stat. Ann. art. 581-33F cmt.). "Depending on the circumstances, a control person might
include an employer, an officer or director, a large shareholder, a parent company, and a management
company." Tex. Rev. Civ. Stat. Ann. art. 581-33F cmt. "The rationale for control person liability
is that a control person is in a position to prevent the violation and may be able to compensate the
injured investor when the primary violator . . . is not." Id.

 At trial, the plaintiff bears the initial burden of proving control. To do so, the plaintiff
must prove that the alleged control person (1) had actual power or influence over the controlled
person, and (2) had the power to control or influence the specific transaction or activity that gave rise
to the underlying violation. Barnes, 97 S.W.3d at 763; Frank, 11 S.W.3d at 384; see also Abbott
v. Equity Group, Inc., 2 F.3d 613, 620 (5th Cir. 1993). The plaintiff need not prove that the alleged
control person culpably participated in the primary violation. (10) Barnes, 97 S.W.3d at 763-64. Nor
is it an element of the plaintiff's case to prove that the alleged control person had any knowledge of
the facts on which liability is based. Id. Rather, such a showing constitutes an affirmative defense
for which the defendant bears the burden of proof:


There is a defense that the control person did not know and, in the exercise of
reasonable care could not have known of the facts on which the liability is based, e.g.
the untruth or omission of material information, or the fact that the securities were
not registered and should have been.



Tex. Rev. Civ. Stat. Ann. art. 581-33F cmt.; see also Barnes, 97 S.W.3d at 763-64.

 Merrill Lynch asserts that it was not a control person of Bounds because it did not
have the power to control or influence the specific transaction or activity that gave rise to the
underlying violation. Merrill Lynch acknowledges that it has day-to-day control over Bounds in
matters concerning his employment, but it asserts that because the violation in question concerned
Bounds's outside businesses, it cannot be considered to have had the power to control Bounds in
that transaction. 

 Fernea argues that "Merrill Lynch had control of all aspects of Mr. Bounds's business
relevant in this case." He asserts that Merrill Lynch had the power to "approve and monitor and
prohibit Mr. Bounds's sale to Mr. Fernea" and to prohibit the transaction altogether. As evidence
of its control, Fernea cites Merrill Lynch's responses to his requests for admission and the deposition
testimony of Ms. Logann. Fernea's request for admission 18 stated:


REQUEST: [Admit] that you authorized Bounds' [sic] ownership of the
Companies.


RESPONSE: Admitted. Although NASD Conduct Rule 3030 does not
require that the firm "authorize" outside interests, Merrill
Lynch imposes such a requirement. Merrill Lynch admits that
it authorized Mr. Bounds's role as a director and officer of
PBC Marketing Co., Bounds & Pinto Marketing, and
Austrends Co., and employment by Bounds & Pinto
Marketing.



In her deposition, Ms. Logann testified:


Q. Okay. Can you tell me what happens when--assuming [NASD Rule] 3040
applies, what happens when Merrill Lynch approves the transaction.


A. When Merrill Lynch approves--I would not know that.


Q. Okay. Well, isn't it contained in this rule here, 3040?


A. Well, and I can--let me--allow me to read it.


Q. Sure.


. . . .


Q. Okay. What happens if Merrill Lynch approves the transaction?


A. Well, we'd first have to get written notification.


Q. Okay.


A. And then if they receive--if Merrill Lynch approved it, then it would go on
the records of Merrill Lynch.


Q. Okay. And they would supervise and monitor the transaction?


A. Yes. They would be required to.


Q. As if it were basically a sale by Merrill Lynch.


A. Yes.


Q. And what would happen if Merrill Lynch disapproved the transaction?


A. Then the transaction should not take place.


Q. In any form or fashion?


A. In any form or fashion.



In addition, Merrill Lynch's private-client branch office policy manual stated that: "Merrill Lynch
policy prohibits employees from engaging in any private securities transaction without full disclosure
to and prior written approval from the corporation." Logann testified that the practical effect of this
policy was that, as a condition of Bounds's employment, he was prohibited from engaging in a
private securities sale unless he obtained written permission from Merrill Lynch.

 Merrill Lynch argues that it did not have the power to control Bounds's sale to Fernea
because it conclusively established that "it had no knowledge of that transaction and no participation
in it." Above, we have held that Merrill Lynch conclusively proved it did not receive written notice
of the securities sale to Fernea as required by NASD rule 3040. As previously discussed, such lack
of notice means that Merrill Lynch did not have a duty imposed by the rule to approve or deny the
transaction. See NASD Rule 3040. Merrill Lynch appears to equate this duty with the power to
control or influence the transaction. We do not think, however, that the duty to control Bounds's
outside securities transaction is synonymous with the power to "control or influence" that
transaction. See Barnes, 97 S.W.3d at 763. Logically, conclusive proof of the absence of a duty to
control does not constitute conclusive proof of the absence of the power to control or influence. See
Black's Law Dictionary 580, 1288 (9th ed. 2009) (defining duty as "a legal obligation that is owed
or due to another and that needs to be satisfied; an obligation for which somebody else has a
corresponding right"; defining power as "the ability to act or not act; esp., a person's capacity for
acting in such a manner as to control someone else's responses").

 We conclude that the record contains more than a scintilla of evidence that Merrill
Lynch's policies--which define the scope of Bounds's employment relationship with Merrill
Lynch--gave Merrill Lynch the power to control or influence the transaction at issue here. See Tex.
Rev. Civ. Stat. Ann. art. 581-33F cmt. (power to control or influence can arise by contract). 
First, the policies required that Bounds obtain permission to own and participate in his outside
business. Second, they prohibited Bounds "from engaging in any private securities transaction
without full disclosure to and prior written approval from [Merrill Lynch]." Thus, as a condition of
Bounds's employment, he agreed not to enter into any outside securities transactions without Merrill
Lynch's permission. Such power to control is not dependent on any notice, but rather arises from
the employment bargain that Bounds struck with Merrill Lynch. In light of this bargain, we cannot
say that Merrill Lynch has conclusively proved that it did not have the power to control or influence
the specific transaction at issue here.

 Moreover, even if we focused exclusively on rule 3040 and concluded that Merrill
Lynch's power was only co-extensive with its duty--i.e., that it only had the power to control when
rule 3040 imposed a duty to do so--Merrill Lynch would still not be entitled to summary judgment. 
Although Merrill Lynch conclusively proved that it did not receive the detailed, written notice
required by rule 3040, the absence of such detailed notice (or lack of notice generally) would not
conclusively negate either element of the control-person test. Although Fernea would, at trial, bear
the burden of proof on the two elements of the control-person test, he would not need to prove that
Merrill Lynch had notice of the transaction. Rather, the legislature decided to place the burden on
the defendant to prove "that he did not know, and in the exercise of reasonable care could not have
known, of the existence of the facts by reason of which the liability is alleged to exist." Tex. Rev.
Civ. Stat. Ann. art. 581-33F § 1. Allowing Merrill Lynch to defeat Fernea's prima facie case by
proving lack of notice would mean, in essence, that lack of notice was an element of Fernea's
claim--which it is not. Rather, lack of actual notice is the first element of the statutory affirmative
defense. As to that affirmative defense, we need not decide whether Merrill Lynch has conclusively
proved that it lacked actual notice of the securities sale because Merrill Lynch has not attempted to
prove the second element of the defense--that in the exercise of reasonable care it could not have
known of the relevant facts.

 Merrill Lynch argues that Barnes v. SWS Financial Services is dispositive here. 
Although the facts in Barnes are similar in some respects to those in the present case, there are
critical differences. In that case, Brooks, a registered agent for a broker-dealer, operated an outside
business specializing in selling church-related securities. Barnes, 97 S.W.3d at 761. Instead of
investing the money he received from the securities sales, Brooks spent the money on personal
expenses. Id. Brooks's investors sued his brokerage firm, asserting that it was liable to them as a
control person. The trial court granted summary judgment in favor of the firm, holding that the
evidence conclusively established that the firm lacked the power to control the transactions at issue.

 Barnes differs from the present case in two crucial ways. First, and most importantly
here, Merrill Lynch's policies conditioned Bounds's employment on the power to control outside
transactions such as the one at issue here. There was no evidence of such an agreement in Barnes. 
Second, the defendant in Barnes moved for both no-evidence and traditional summary judgment. 
Here, Merrill Lynch filed only a traditional motion as to this claim. The Barnes court focused largely
on the lack of evidence establishing control, not solely on the evidence affirmatively demonstrating
lack of control, as we must do. See id. at 765.

 In sum, we hold that Merrill Lynch has neither conclusively negated one of the
elements of the control-person test, nor conclusively established both elements of the relevant
affirmative defense; thus, it has not shown itself entitled to summary judgment as to Fernea's
control-person claim. Accordingly, we sustain Fernea's fifth issue.

CONCLUSION

 Because the trial court erred in granting summary judgment for Merrill Lynch on
Fernea's control-person cause of action, we reverse the court's judgment as to that claim and remand
that portion of the cause to the trial court for further proceedings. We affirm the remainder of the
trial court's judgment in favor of Merrill Lynch.





 

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Puryear and Pemberton

Affirmed in part; Reversed and Remanded in part

Filed: January 7, 2011
1. Fernea also pleaded that Bounds was acting as Merrill Lynch's agent in the transaction, but
does not appeal the trial court's grant of summary judgment on the claims founded on that theory
of liability.
2. The NASD is a "a self-regulatory organization overseeing securities transactions." 
In re Next Fin. Group, Inc., 271 S.W.3d 263, 265 (Tex. 2008) (per curiam). Although the
NASD "absorbed the enforcement arm of the New York Stock Exchange and became the Financial
Industry Regulation Authority (FINRA) on July 30, 2007," see McArdle v. Jack Nelson IRA,
No. 03-08-00057-CV, 2010 WL 1253571, at *1 n.1 (Tex. App.--Austin Mar. 31, 2010, no pet.)
(mem. op.), we will still refer to the NASD and the NYSE for convenience. Pursuant to SEC
regulations, licensed securities brokers must register with and abide by the organization's guidelines. 
Id.; see also 17 C.F.R. § 240.15b7-1 (2009).
3. Although Fernea does not state whether his private cause of action arises under federal
securities law or Texas law, self-regulating securities organizations are entities created and governed
by federal statute and regulation. Accordingly, we assume that any private cause of action would
arise from federal securities law.
4. Moreover, some courts have held that the voluntary-undertaking exception to the no-duty
rule applies only to "situations where bodily injury or [physical] injury to property belonging to the
party is involved." Wal-Mart Stores, Inc. v. Lane, 31 S.W.3d 282, 293 (Tex. App.--Corpus Christi
2000, pet. denied); see also Sibley v. Kaiser Found. Health Plan of Tex., 998 S.W.2d 399, 403 (Tex.
App.--Texarkana 1999, no pet.). Here, no physical injury or property damage was alleged.
5. Although sometimes argued by the parties as a cause of action for negligent supervision
and training, Fernea's petition alleged only that Merrill Lynch negligently failed to supervise
Bounds. Accordingly, we need only address the parties' arguments with respect to that claim.
6. The tort of negligent hiring, supervision, or training is a direct tort brought against an
employer, separate and apart from a claim for vicarious liability. Houser v. Smith, 968 S.W.2d 542,
544 n.4 (Tex. App.--Austin 1998, no pet.). 
7. Several of our sister courts have also held that an employer's duty in hiring, training, and
supervision only requires it to prevent its employees from causing physical harm to third parties. 
See Wrenn v. G.A.T.X. Logistics, Inc., 73 S.W.3d 489, 496 (Tex. App.--Fort Worth 2002, no pet.)
("The duty of the employer extends only to prevent the employee or independent contractor from
causing physical harm to a third party."); Sibley, 998 S.W.2d at 403-04 (same); Verinakis v. Medical
Profiles, Inc., 987 S.W.2d 90, 97-98 (Tex. App.--Houston [14th Dist.] 1998, pet. denied) (same)
(citing Restatement (Second) of Torts § 315); see also McClure v. Kingwood Pines Hosp., L.L.C.,
No. 14-09-00339-CV, 2010 WL 3583193, at *2 (Tex. App.--Houston [14th Dist.] Sept. 16, 2010,
pet. filed) (mem. op.) (declining to reconsider whether physical harm is requirement for recovery);
Doege v. Sid Peterson Mem'l Hosp., No. 04-04-00570-CV, 2005 WL 1521193, at *7 (Tex.
App.--San Antonio June 29, 2005, pet. denied) (mem. op.) (physical harm required for recovery). 
This Court has not addressed whether the duty to hire, train, and supervise only extends to protecting
third parties from physical harm, nor is it necessary for us to do so here. Merrill Lynch did not argue
to the trial court--nor does it argue on appeal--that Fernea's lack of physical damages was a ground
for granting summary judgment. See Johnson v. Brewer & Pritchard, P.C., 73 S.W.3d 193, 204
(Tex. 2002) ("A court cannot grant summary judgment on grounds that were not presented.").
8. In paragraphs 14 and 18, Logann averred that Merrill Lynch did not broker the sale of
Bound's companies and otherwise had no contact with Fernea, and that Merrill Lynch maintained
a reasonable compliance protocol that it did not breach here.
9. As discussed above, Merrill Lynch did not move for a no-evidence summary judgment on
Fernea's control-person claim. Thus, it bore the burden of either conclusively negating an element
of Fernea's cause of action or conclusively proving each element of an applicable affirmative
defense. See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798
(Tex. 2003).
10. The federal courts are split as to whether the plaintiff bears the burden to prove culpable
participation. Compare SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996)
(plaintiff must prove that controlling person "was in some meaningful sense a culpable participant
in the fraud perpetrated by the controlled person"), with Abbott v. Equity Group, Inc., 2 F.3d 613,
620 n.18 (5th Cir. 1993) (noting that earlier Fifth Circuit opinion did not "accurately reflect our
rejection . . . of the 'culpable participation' requirement").

 The Texarkana Court of Appeals has held that culpable participation is a required element
to establish control-person liability. See Texas Capital Sec. Mgmt., Inc. v. Sandefer, 80 S.W.3d 260,
268 (Tex. App.--Texarkana 2002, pet. struck). In doing so, the Texarkana court relied solely on the
Fifth Circuit's opinion in Dennis v. General Imaging, Inc., 918 F.2d 496, 509 (5th Cir. 1990), which
that court later held to be inaccurate. See Abbott, 2 F.3d at 620 n.18.

 We join our sister courts in Houston and Dallas in rejecting the culpable-participation
requirement. See Barnes v. SWS Fin. Servs. Inc., 97 S.W.3d 759, 763 (Tex. App.--Dallas 2003,
no pet.); Frank v. Bear, Stearns & Co., 11 S.W.3d 380, 384 (Tex. App.--Houston [14th Dist.] 2000,
pet. denied).